LOCAL 1330, UNITED STEEL WORK-
ERS OF AMERICA, and Frank Geor-
ges, et al., Plaintiffs-Appellants.

v.

UNITED STATES STEEL CORPORA-
TION, Defendant-Appellee.

Nos. 80–3217, 80–3273 and 80–3366.

United States Court of Appeals,
Sixth Circuit.

Argued June 18, 1980.

Decided July 25, 1980.

represent production and maintenance employees at the Ohio and McDonald Works, respectively.

Robert M. Clyde, Jr., Staughton Lynd and James B. Callen, James A. Denney, Youngstown, Ohio, Ramsey Clark, New York City, for plaintiffs-appellants.

Charles F. Clarke and Glenn M. Young, Squire, Sanders & Dempsey, Cleveland, Ohio, James T. Carney and S. G. Clark, Jr., Pittsburgh, Pa., for defendant-appellee.

Albert Strobel, Asst. County Prosecutor, Mahoning County, Ohio, Youngstown, Ohio, amicus curiae for County Commissioners of Mahoning County, Ohio.

Michael Ratner, Center for Constitutional Rights, Arthur Kinoy, New York City, amicus curiae for Center for Constitutional Rights.

Walter B. Connolly, Jr., Pepper, Hamilton & Scheetz, Washington, D. C., amicus curiae for Chamber of Commerce.

Before EDWARDS, Chief Judge, MERRITT, Circuit Judge, and PECK, Senior Circuit Judge.

## EDWARDS, Chief Judge.

This appeal represents a cry for help from steelworkers and townspeople in the City of Youngstown, Ohio who are distressed by the prospective impact upon their lives and their city of the closing of two large steel mills. These two mills were built and have been operated by the United States Steel Corporation since the turn of the century. The Ohio Works began producing in 1901; the McDonald Works in 1918. The District Court which heard this cause of action found that as of the notice of closing, the two plants employed 3,500 employees.

The leading plaintiffs[1] are two labor organizations, Locals 1330 and 1307 of the United Steel Workers of America. This union has had a collective bargaining contract with the United States Steel Corporation for many years. These local unions

In the background of this litigation is the obsolescence of the two plants concerned, occasioned both by the age of the facilities and machinery involved and by the changes in technology and marketing in steelmaking in the years intervening since the early nineteen hundreds.

For all of the years United States Steel has been operating in Youngstown, it has been a dominant factor in the lives of its thousands of employees and their families, and in the life of the city itself. The contemplated abrupt departure of United States Steel from Youngstown will, of course, have direct impact on 3,500 workers and their families. It will doubtless mean a devastating blow to them, to the business community and to the City of Youngstown itself. While we cannot read the future of Youngstown from this record, what the record does indicate clearly is that we deal with an economic tragedy of major proportion to Youngstown and Ohio's Mahoning Valley. As the District Judge who heard this case put the matter:

> Everything that has happened in the Mahoning Valley has been happening for many years because of steel. Schools have been built, roads have been built. Expansion that has taken place is because of steel. And to accommodate that industry, lives and destinies of the inhabitants of that community were based and planned on the basis of that institution: Steel.

In the face of this tragedy, the steel worker local unions, the Congressman from this district, and the Attorney General of Ohio have sued United States Steel Corporation, asking the federal courts to order the United States Steel Corporation to keep the two plants at issue in operation. Alternatively, if they could not legally prevail on that issue, they have sought intervention of the courts by injunction to require the United States Steel Corporation to sell the two plants to the plaintiffs under an as yet

---

1. Other plaintiffs include two office and technical worker locals of the United Steel Workers, the Congressman from the district concerned, and the Attorney General of Ohio.

tentative plan of purchase and operation by a community corporation and to restrain the piecemeal sale or dismantling of the plants until such a proposal could be brought to fruition.

Defendant United States Steel Corporation answered plaintiffs' complaints, claiming that the plants were unprofitable and could not be made otherwise due to obsolescence and change in technology, markets, and transportation. The company also asserts an absolute right to make a business decision to discharge its former employees and abandon Youngstown. It states that there is no law in either the State of Ohio or the United States of America which provides either legal or equitable remedy for plaintiffs.

The District Judge, after originally restraining the corporation from ceasing operations as it had announced it would, and after advancing the case for prompt hearing, entered a formal opinion holding that the plants had become unprofitable and denying all relief. We believe the dispositive paragraphs of a lengthy opinion entered by the District Judge are the following:

This Court has spent many hours searching for a way to cut to the heart of the economic reality—that obsolescence and market forces demand the close of the Mahoning Valley plants, and yet the lives of 3500 workers and their families and the supporting Youngstown community cannot be dismissed as inconsequential. United States Steel should not be permitted to leave the Youngstown area devastated after drawing from the lifeblood of the community for so many years.

Unfortunately, the mechanism to reach this ideal settlement, to recognize this new property right, is not now in existence in the code of laws of our nation.

\*   \*   \*   \*   \*   \*

This Court is mindful of the efforts taken by the workers to increase productivity, and has applauded these efforts in the preceding paragraphs. In view of the fact, however, that this Court has found that no contract or enforceable promise was entered into by the company and that, additionally, there is clear evidence to support the company's decision that the plants were not profitable, the various acts of forebearance taken by the plaintiffs do not give them the basis for relief against defendant.

Plaintiffs-appellants claim that certain of the District Judge's findings of fact are clearly erroneous, that he has misconstrued federal and state contract law, and that he failed to grant a hearing on their antitrust claims.

With this introduction, we turn to the legal issues presented by this appeal.

## I. THE CAUSE OF ACTION

Plaintiffs assert jurisdiction in the federal courts, pursuant to Section 301 of the National Labor Relations Act, as amended, 29 U.S.C. § 185 (1976).[2] They also assert

---

**2.** Section 301 of the National Labor Relations Act provides:

**Venue, amount, and citizenship**

(a) Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

**Responsibility for acts of agent; entity for purposes of suit; enforcement of money judgments**

(b) Any labor organization which represents employees in an industry affecting commerce as defined in this chapter and any employer whose activities affect commerce as defined in this chapter shall be bound by the acts of its agents. Any such labor organization may sue or be sued as an entity and in behalf of the employees whom it represents in the courts of the United States. Any money judgment against a labor organization in a district court of the United States shall be enforceable only against the organization as an entity and against its assets, and shall not be enforceable against any individual member or his assets.

**Jurisdiction**

(c) For the purposes of actions and proceedings by or against labor organizations in the district courts of the United States, district courts shall be deemed to have jurisdiction of a labor organization (1) in the district in which such organization maintains its principal office, or (2) in any district in which its duly authorized officers or agents are en-

diversity jurisdiction, pursuant to 28 U.S.C. § 1332 (1976). By so doing they claim that this action is brought under the fundamental labor law of the country and under the laws of Ohio which federal courts follow when a cause of action between citizens of one state is brought against citizens of another state.

The primary issue in this case is a claim on the part of the steel worker plaintiffs that United States Steel made proposals to the plaintiffs and/or the membership of the plaintiffs to the general effect that if the workers at the two steel plants concerned put forth their best efforts in terms of productivity and thereby rendered the two plants "profitable," the plants would then not be closed. It is clear that this claimed contract does not rest upon any formal written document, either authorized or signed by the parties to this lawsuit.

Plaintiffs themselves recognize that they cannot rely upon any formal contract law. Nonetheless, in this section we shall discuss relationships between the parties which plaintiffs have not raised in order to place their issues in proper context.

As noted above, the steelworkers have a formal collective bargaining contract with the U.S. Steel Corporation. In this record there is no indication that there ever was any formal negotiation or amendment of that contract in relation to the issues of this case. Further, there is no indication in this record that the contract alleged in this complaint could be the subject for arbitration under Section 8(A)(2) of the Steelworkers Agreement of August 1, 1977:

The Board shall have jurisdiction and authority only to interpret, apply, or determine compliance with the provisions of this Agreement and such local working conditions as may hereafter be in effect in the plants of the Company, insofar as

gaged in representing or acting for employee members.
**Service of Process**
(d) The service of summons, subpoena, or other legal process of any court of the United States upon an officer or agent of a labor organization, in his capacity as such, shall constitute service upon the labor organization.

shall be necessary to the determination of grievances appealed to the Board. The Board shall not have jurisdiction or authority to add to, detract from, or alter in any way the provisions of this Agreement.

Nor is there any indication in this appellate record that the claimed contract ever was made a subject for arbitration under Section 7(A)(8), which provides:

If the officers of the Company and of the Union shall so agree in writing, any request or complaint not a proper matter of grievance and thus not appealable to the Board, or other matter not covered by the procedures of Section 6—Adjustment of Complaints and Grievances, may be referred to the Board for determination upon such terms as the parties may mutually agree.

The collective bargaining agreement applicable in this period also contains three sections which management asserts bear directly upon its claim of unilateral right to close any plant. These provisions are two rather general paragraphs on page 15 of the contract entitled "Management" which recite as follows:

### SECTION 3—MANAGEMENT

The Company retains the exclusive rights to manage the business and plants and to direct the working forces. The Company, in the exercise of its rights, shall observe the provisions of this Agreement.

The rights to manage the business and plants and to direct the working forces include the right to hire, suspend or discharge for proper cause, or transfer and the right to relieve employees from duty because of lack of work or for other legitimate reasons.

**Determination of question of agency**
(e) For the purposes of this section, in determining whether any person is acting as an "agent" of another person so as to make such other person responsible for his acts, the question of whether the specific acts performed were actually authorized or subsequently ratified shall not be controlling.
29 U.S.C. § 185 (1976).

More directly applicable to the present case is Section 16 entitled "Severance Allowance." This section provides in detail for severance allowances in terms of weeks of pay of employees with more than three years seniority, and concludes with the sentence which says, "Acceptance of severance allowance shall terminate employment and continuous service for all purposes under this Agreement."

## SECTION 16—SEVERANCE ALLOWANCE

### A. Conditions of Allowance

When, in the sole judgment of the Company, it decides to close permanently a plant or discontinue permanently a department of a plant or substantial portion thereof and terminate the employment of individuals, an employee whose employment is terminated either directly or indirectly as a result thereof because he was not entitled to other employment with the Company under the provisions of Section 13—Seniority of this Agreement and Paragraph B–2 below shall be entitled to a severance allowance in accordance with and subject to the following provisions.

### B. Eligibility

Such an employee to be eligible for a severance allowance shall have accumulated three or more years of continuous Company service as computed in accordance with Section 13—Seniority of this Agreement.

1. In lieu of severance allowance, the Company may offer an eligible employee a job, in at least the same job class for which he is qualified, in the same general locality. The employee shall have the option of either accepting such new employment or requesting his severance allowance. If an employee accepts such other employment, his continuous service record shall be deemed to have commenced as of the date of the transfer, except for the purposes of severance allowance under this Section and for purposes of Section 12—Vacations his previous continuous service record shall be maintained and not be deemed to have been broken by the transfer.

2. As an exception to Paragraph 1 above, an employee otherwise eligible for severance allowance who is entitled under Section 13—Seniority to a job in at least the same job class in another part of the same plant shall not be entitled to severance allowance whether he accepts or rejects the transfer. If such transfer results directly in the permanent displacement of some other employee, the latter shall be eligible for severance allowance provided he otherwise qualifies under the terms of this Section.

### C. Scale of Allowance

An eligible individual shall receive severance allowance based upon the following weeks for the corresponding continuous Company service:

| Continuous Company Service | Weeks of Severance Allowance |
|---|---|
| 3 years but less than 5 years | 4 |
| 5 years but less than 7 years | 6 |
| 7 years but less than 10 years | 7 |
| 10 years or more | 8 |

### D. Calculation of Allowance

A week's severance allowance shall be determined in accordance with the provisions for calculation of vacation pay as set forth in Section 12—Vacations.

### E. Nonduplication of Allowance

Severance shall not be duplicated for the same severance, whether the other obligation arises by reason of contract, law, or otherwise. If an individual is or shall become entitled to any discharge, liquidation, severance, or dismissal allowance or payment of similar kind by reason of any law of the United States of America or any of the states, districts, or territories thereof subject to its jurisdiction, the total amount of such payments shall be deducted from the severance allowance to which the individual may be entitled under this Section, or any payment made by the Company under this Section may be offset against such payments. Statutory unemployment com-

pensation payments shall be excluded from the nonduplication provisions of this paragraph.

F. Election Concerning Layoff Status

Notwithstanding any other provision of this Agreement, an employee who would otherwise have been terminated in accordance with the applicable provisions of this Agreement and under the circumstances specified in Section 16–A may, at such time, elect to be placed upon layoff status for 30 days or to continue on layoff status for an additional 30 days if he had already been on layoff status. At the end of such 30-day period he may elect to continue on layoff status or to be terminated and receive severance allowance if he is eligible to any such allowance under the provisions of this Section 16; provided, however, if he elects to continue on layoff status after the 30-day period specified above, and is unable to secure employment with the Company within an additional 60-day period; at the conclusion of such additional 60-day period he may elect to be terminated and receive severance allowance if he is eligible for such allowance. Any Supplemental Unemployment Benefit payment received by him for any period after the beginning of such 30-day period shall be deducted from any such severance allowance to which he would have been otherwise eligible at the beginning of such 30-day period.

G. Payment of Allowance

Payment shall be made in a lump sum at the time of termination. Acceptance of severance allowance shall terminate employment and continuous service for all purposes under this Agreement.

The contract from which we have been quoting is dated August 1, 1977, and provides for termination 60 days after written notice by either party, "but in any event shall not terminate earlier than August 1, 1980." This agreement was formally executed by authorized officers of the U.S. Steel Corporation and the United Steelworkers of America and its various negotiating committees, including the presidents of the two local unions representing the production workers at the two plants concerned, namely Local Union 1307 and 1330.

We are unable to construe any claims set forth in the instant litigation as being based upon any language contained in this collective bargaining agreement. Indeed, plaintiffs make no claim in this case that the United States Steel Corporation has violated the provisions of this section (or any section) of the collective bargaining agreement.

The defendant company also claims that plaintiffs reliance upon any oral contract is defeated by Section 2–B of the contract entitled "Local Working Conditions." Paragraph 5 thereof provides:

No local working condition shall hereafter be established or agreed to which changes or modifies any of the provisions of this Agreement, except as it is approved in writing by an International Officer of the Union and the Personnel Services Executive of the Company.

It is clear that the approvals called for in the just quoted paragraph never occurred. It is somewhat less clear that the extraordinary developments relied on by plaintiffs are properly termed "local working conditions."

■ The District Judge's rejection of any formal legal contract claims was clearly mandated by both state and federal contract law. The lack of such features as a written document, authorization by the corporate Board of Directors and the Executive Boards of the steelworkers national and local bodies, a stated contract period, specified mutual consideration, all serve to demonstrate that the minimum features of a formal legal contract are missing.

Appellants' principal argument in this appeal is, however, that the District Court should have found a contract based upon the equitable doctrine of promissory estoppel, which contract is enforceable in the federal courts under § 301 of the National Labor Relations Act.

## II. PROMISSORY ESTOPPEL

■ The doctrine of promissory estoppel recognizes the possibility of the formation of a contract by action or forbearance on

the part of a second party, based upon a promise made by the first party under circumstances where the actions or forbearance of the second party should reasonably have been expected to produce the detrimental results to the second party which they did produce. Restatement (Second) of Contracts § 90 (1932) states:

A promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. Restatement (Second) of Contracts § 90 (1932).

Thus, appellants' contract claim depends essentially upon oral statements and newspaper releases concerning the efforts of the company to secure increased productivity by enlisting the help of the workers of the plant and upon the employee responses thereto. The representations as set forth in the steelworkers' complaint include many oral statements made over the "hotline" employed by management in the plants [3] to advise U.S. Steel employees of company policy. They began in the Fall of 1977 in the midst of much public speculation that the Ohio and McDonald works at Youngstown were to be closed.[4] In general they follow the very first statement made by William Ashton, then superintendent of Youngstown works of U.S. Steel, on September 1, 1977, which said:

In response to many rumors, I want to tell you that there are no immediate plans to permanently shut down either the Ohio Works or McDonald Mills.

However, steps will have to be taken to improve these plants' profitability. These steps, which have been and are currently under study, will require the suspension and consolidation of some operations in the months ahead.

Ohio Works and McDonald Mills are faced with very serious profit problems caused by a combination of heavy imports of foreign steel, higher energy costs, higher taxes and, of course, environmental expenditures.

The continued operation of these plants is absolutely dependent upon their being profit-makers.

In the months ahead, we will be calling for the full support of each and every one of you. Your cooperation and assistance is absolutely necessary if our facilities are to continue to operate.

Many similar statements were made by the company and were responded to by the employees. As 1977 and 1978 went by, there began to be statements over similar facilities and sometimes by company press releases indicating improvement in productivity at the two Youngstown facilities. Some of these included reference to "a complete turnaround" and reference to the Youngstown plants as "profitable" and once again viable.

The opposite side of the contract bargain alleged by plaintiffs consists of performance claimed by plaintiffs to have been induced by the sort of promises recited above and actions taken by them "in detrimental reliance" upon said promises.

Our examination of this issue requires much fuller recital of the promises and the actions they are alleged to have induced than we have quoted thus far. Plaintiffs' second amended complaint states the promises as follows:

"a. After a visit to the Ohio and McDonald Works by David Roderick, then President of Defendant United States Steel, in August 1977, William Ashton, then Superintendent of the Youngstown District for Defendant, on September 1, 1977, made the following statement over the intra-company or 'hot line' telephone to Defendant's Youngstown employees:

"Hello, this is Bill Ashton.

In response to many rumors, I want to tell you that there are no immediate plans to permanently shut down either the Ohio Works or McDonald Mills.

---

**3.** Telephones were placed strategically in these plants so that employees could hear prerecorded management policy statements.

**4.** U.S. Steel introduced exhibits of letters announcing the closing of both plants which were dated August 25, 1977, but were never mailed.

However, steps will have to be taken to improve these _plants' profitability. These steps, which have been and are currently under study, will require the suspension and consolidation of some operations in the months ahead.

Ohio Works and McDonald Mills are faced with very serious profit problems caused by a combination of heavy imports of foreign steel, higher energy costs, higher taxes and, of course, environmental expenditures.

The continued operation of these plants is absolutely dependent upon their being profit-makers.

In the months ahead, we will be calling for the full support of each and every one of you. Your cooperation and assistance is absolutely necessary if our facilities are to continue to operate."

"Mr. Ashton also released this statement to the press. At 3 P.M. on September 1, 1977, Mr. Ashton convened the grievance committees of Locals 1330 and 1307 in the conference room of the Youngstown District headquarters on Salt Springs Road and read them the press release.

"b. On or about September 14, 1977, Randall Walthius, an agent of Defendant, stated to the press that studies were under way

"aimed at making the Youngstown facilities profitable and it is on the basis of the plants' profitability that they will continue to operate."

"c. On or about January 3, 1978, Edgar Speer, then Chairman of the Board of United States Steel, was asked by a NEW YORK TIMES reporter whether at some point the Ohio and McDonald Works would have to be closed, and answered, 'Yup.'

"d. On or about January 4, 1978, Andrew Starsky, an agent of Defendant, clarified Mr. Speer's comment by stating to the press: 'There has been no decision made in regard to closings in the Youngstown area.' Mr. Starsky added: 'I don't think the situation is any different today than in September, when our people in Youngstown began a reorganization and consolidation of operations.'

"e. Also on January 4, 1978, William Kirwan, Superintendent of the Youngstown District for Defendant, made the following statements on the 'hot line':

"Hello, this is Bill Kirwan talking, and I want to set the record straight on what you read in the paper concerning our facilities. Mr. Speer's comments yesterday, are essentially the same as the announcement made last September when the Company said there were *no immediate* plans to shut down the Youngstown operations. At that time United States Steel said that continued operation in Youngstown would depend on the plant's ability to become profitable. Since that time some progress *has* been made in reducing our losses. With your help, this effort will continue and if and when there will be a phase-out depends on the plant's profitability, but no time table has been set. I intend to give this my best effort and I am confident you will too." (Emphasis in original.)

"f. On January 11, 1978, Mr. Kirwan also stated on the 'hot line':

"Hello. This is Bill Kirwan and I want to bring you up to date on where we stand after that misleading news story last week.

Rube Perin, who is our Vice President of Sales, sent a letter on Tuesday to every one of our customers that I will read in part. He says, quote, 'I want to assure you that no decision has been made to close these facilities and they continue to be an integral part of the company's plans,' end quote. . . ."

"g. At an undetermined date during the winter of 1977–78, J. Hepplewhite, an agent of Defendant, stated on the 'hot line':

"The future of our continued operations at Youngstown is dependent upon our ability to be a profit maker. To achieve this end each of us must accept the challenge to be innovative and continue to produce quality products for our customers."

"h. On or about April 7, 1978, Mr. Kirwan stated on the 'hot line':

"Hello, this is Bill Kirwan.

I want to share the good news with all of you.

In the month of March, for the first [time] in a long long time, the Youngstown Works earned a profit for the United States Steel Corporation.

We didn't make a bundle, and we are still in the hole for the year, but this is the first indication that the changes in our operations, and our attitudes are turning the place around.

While one month's profits doesn't solve our problems, it sure shows U. S. Steel, our customers and our families that the goal set for us *is* attainable.

We got the orders and the opportunity to make April even a better month. Keep up the momentum—our future is what we make it."

"(Emphasis in original.)

"i. On or about April 17, 1978, Mr. Kirwan stated to the press about the Youngstown District facilities, 'We'll be doing business here for some time to come.'

"j. On or about April 17, 1978, Mr. Walthius stated to the press about the Youngstown District facilities:

"Company management has repeatedly said that the works will stay open if they become profitable. Well, now they are profitable."

"k. On November 8, 1978, Mr. Kirwan stated on the 'hot line':

"Hello, this is Bill Kirwan.

As you already know, by the grapevine, the chopper was in yesterday with the top executives of Eastern Steel. Visits are being made to all the plants to discuss problems facing us in 1979. On the basis of your performance so far this year our outlook is pretty good. . . .

Improved productivity is almost entirely up to you. I am asking each of you to consider how you may help in keeping Youngstown the going plant it is today."

"l. On December 21, 1978, Mr. Kirwan stated on the 'hot line':

"Hello, this is Bill Kirwan.

You will recall that early in 1978 we initiated significant changes in our operations in order to make Youngstown Works profitable and once again a viable plant. Our efforts took many turns, but we have attained our 1978 goal which was 'survival' and now we embark on the 1979 goal which is 'revival.'

I want to express my thanks to every man and woman employed at McDonald Mills and the Ohio Works for your efforts and contributions to this success. Ed Speer has always said that Youngstown Works has the best bunch of steelworkers in the business. I couldn't say it any better myself. . . ."

"m. On April 26, 1979, William Kirwan, C. I. Richards, Jr., an agent of Defendant, and R. M. Greer, an agent of Defendant, wrote a letter to the WALL STREET JOURNAL which was printed shortly thereafter. The letter stated:

"Dear Sir:

Regarding your report on United States Steel Corporation First Quarter, 1979 earnings, which appeared on Page 3 of the April 25th, 1979 edition, it is deeply concerning that the Wall Street Journal has resorted to reporting 'hearsay' when you make reference to the fact that steel making facilities at Youngstown are not efficient and should be closed. You imply by this statement that Youngstown is eroding U.S. Steel Corporation's profit. Factually, this is nonsense and reflects the opinions of someone who doesn't know the facts and never bothered to get them.

Your paper should be reminded of the following:

1. A complete turn-around has been achieved at Youngstown in the past year due to an aggressive management effort, streamlining of operations, and hard work on the part of all employees.

2. Youngstown Works is creating a tremendously favorable impact that is sorely needed in the Mahoning Valley economy by keeping 3500 people working. This is also being done without any governmental assistance or handout.

3. As long as a plant can generate an acceptable return, and the facilities are

being poorly [sic] [properly?] maintained, facility age need not be a significant factor.

Your organization should also be reminded of the morale problems that can be caused amongst people that have worked long and hard to achieve a goal when they read *fiction* in a publication that built its reputation on reporting of facts. Your article was a disservice to every employee at Youngstown Works, and represents the epitome of reportorial irresponsibility. Absent a retraction, the credibility of your publication is extremely questionable.

> W. H. Kirwan
> C. L. Richards, Jr.
> R. M. Greer."

"(Emphasis in original.) The sending of this letter was discussed with representatives of Locals 1330 and 1307, and the published letter was widely read by Defendant's Youngstown employees, as it was intended to be.

"n. On or about May 2, 1979, Mr. Kirwan stated to the press about the Youngstown District facilities:

> "Ten years down the road that may be different, maybe even three years. . . But we currently have an operation here that's been going profitably since the early part of 1978.` . . ."

"o. On or about June 5, 1979, the press attributed to Mr. Kirwan the statement that the Youngstown District finished 1978 in the black and even managed to win a profitability contest against U.S. Steel's much-newer plant in Baytown, Texas, which produces many of the same kinds of products.

"p. On or about June 18, 1979, David Roderick, Chairman of the Board of United States Steel, stated to the press and on ABC television:

> "Simply stated, we have no plans for shutting down our Youngstown operation.
>
> Only two things would result in a Youngstown shutdown: [massive expenditures to meet environmental requirements of [sic] [or?] an unproductive plant operation.]

The Youngstown plant is profitable. We're operating in the black there."

"q. On or about November 1 and 2, 1979, Frederick Foote, an agent of Defendant, stated to a public meeting in Cleveland, Ohio convened by Clergy and Laity Concerned, and to the press:

> "We've said all along the Ohio Works has been profitable and there are no plans for a shutdown."

"The responses and actions which steelworkers alleged were induced by these promises, and which represented detrimental reliance thereon, were as follows:

"Plantwide Issue 11 (attendant at main canteen was promised on 24-hour basis but has been provided no more than 9 hours a day during week and even less on weekends when needed more; 40″ canteen has been closed instead of renovated)

"Plantwide Issue 17 (instead of improving janitorial service for welfare stations, company has reduced janitors from 26 to 16–18)

"Issue 34 (work on welfare station on 3d floor of Sinter Plant has not been done)

"Issue 35 (ventilation at Screening Station was not improved during outage as promised)

"Issue 41 (Open Hearth Mixer Crane has not been air conditioned)

"Issue 47 (Jib Cranes in back of furnaces have not been maintained)

"Issue 49 (paint on designated walkways in Open Hearth has worn off creating safety hazard)

"Issue 50 (stretcher containers have not been painted with fluorescent paint)

"Issue 54 (overhead doors have not been installed in Open Hearth and existing doors have not been maintained)

"Issue 56 (there are still holes in the Crane Shop)

"Issue 57 (new heaters have not been provided in Crane Shop)

"Issue 63 (wooden beams in roof of Diesel Shop have not been replaced)

"Issue 65 (holes around Diesel Shop have not been filled and new shop has been left half finished)

"Issue 70 (fumes have not been removed from garage)

"Issue 73 (switches have not been properly repaired and maintained)

"Issue 77 (sufficient extermination service has not been provided)

"Issue 80 (better lighting in Paint Shop has not been provided)

"Issue 82 (pressure in Carpenter Shop shower has not been corrected)

"Issue 83 (two-way radios are not available to riggers, creating safety hazard)

"Issue 89 (insulated gloves used by Ohio Edison employees have not been provided)

"Issue 90 (roof of No. 33 welfare station still leaks)

"Issue 144 (electric operated steam valve on # 23 and # 15 flying shear does not work and men are still operating manually, creating safety hazard)

"Issue 103 (two-way radios and walkie-talkies have not been provided for crane operator and motor inspector in 40″ mill, creating safety hazard)

"Issue 129 (door in Met Lab has not been relocated)

"Issue 132 (fumes from Open Hearth Lab Alloy cut-off machines are ventilated into rest room).

"b. Because of Defendant's promise and in detrimental reliance thereon, Defendant Youngstown employees immediately began to work harder and to increase their productivity. The results were evident as early as October 1977, when, for the first time in 1977 according to the method of accounting employed by Defendant, the Youngstown District made a monthly profit. Defendant's Manager of Accounting for the Youngstown District reported:

"In October, Youngstown made a *profit* of $34. The importance of this profit can only properly be comprehended if the odds against it, at this level of operations, are clearly understood. The break-even point on October's fixed expenses of $3828 ($3178 Fixed and $650 SG & A) is 74,400 tons based on an M.O.V. of $51.48.

October's shipments of 51,283 tons were 23,100 tons below the break-even point, and therefore, only extraordinary performance variance achievements from hot metal through primary rolling drove the actual variable cost (standard variable cost [plus or minus] cost variances) to $273 per ton below the Standard variable cost of $297. . . .

". . . The Ohio Works variance is the most favorable variance performance achieved since May, 1975. . . .

". . . If Youngstown is judged strictly on its own fixed expense, October's profit would have been $1,408, and the year to date loss would be reduced from the Profit Contribution reports' $19,421 to $4,947."

"(Emphasis in original.)

"c. In further illustration of the action and forbearance induced by Defendant's promise, in detrimental reliance thereon, on March 8, 1978 Mr. Kirwan stated on the 'hot line':

"The Ohio Works is hosting the Corporation's Steel Producing Conference on March 9th and 10th. Representatives from other U.S. Steel Plants will be here to discuss new steel producing projects and to look at our operations. Many improvements have been made to our Open Hearth and through *the outstanding efforts of our personnel, Youngstown's productivity gains are second to none. . . .*"

"(Emphasis added.)

"d. In further illustration of the action and forbearance induced by Defendant's promise, in detrimental reliance thereon, on May 12, 1978 Mr. Kirwan stated on the 'hot line':

"Hello, this is Bill Kirwan.

Congratulations! For the second month in a row, I am happy to report that, due to your outstanding performances, Youngstown Works has, again, been a profitable steel plant.

In April the Blast Furnace Department set a new monthly record and the crews on # 51 Open Hearth did the same. All of you kept on top of your individual assignments and the result is most gratifying. . . ."

"e. In further illustration of the action and forbearance induced by Defendant's promise, in detrimental reliance thereon, on June 1, 1978 Norm Waite, an agent of Defendant, stated on the 'hot line':

"Hello, this is Norm Waite.

I'm very happy to report that for the second month in a row my crew in the Blast Furnace Department has set a monthly production record. This has been accomplished primarily through an improvement in the burden and some innovative operating techniques on their part.

. . . We're trying everything to keep Youngstown District and U.S. Steel profitable."

"f. In further illustration of the action and forbearance induced by Defendant's promise, in detrimental reliance thereon, on September 18, 1978, Al Tkatch, an agent of Defendant, stated on the 'hot line':

"Hello, this is Al Tkatch.

I'm pleased to announce that the sinter plant at the Ohio Works came back into operation last Sunday after being shut down for ten weeks.

Art Mazarakis and all the hard working guys in Engineering and Central Shops did an outstanding job completing this major project right on schedule and for less than the original estimate.

This is the kind of team effort that produces winning results. Penn State, the Steelers and the Browns all won big last week end. So did Youngstown Works."

"g. Because of Defendant's promise and in detrimental reliance thereon, Plaintiff Locals agreed to combine into one seniority list the machinists at the Ohio and McDonald Works. This negotiated understanding was embodied in a "Special Seniority Agreement Covering Craftsman Of McDonald Mills Machine Shop," signed by Charles L. Richards, Superintendent-Employee Relations for Defendant, and Marvin Weinstock, Staff Representative, United Steelworkers of America, and dated December 14, 1978. A similar understanding was negotiated for Boiler Shop employees in the two mills.

"h. As previously alleged in Paragraph 10 k of this Complaint on November 8, 1978 Mr. Kirwan stated on the 'hot line': 'Improved productivity is almost entirely up to you. I am asking each of you to consider how you may help in keeping Youngstown the going plant it is today.' Because of Defendant's promise and in detrimental reliance thereon, Defendant's Youngstown employees worked in such a manner that at an undetermined date subsequent to March 31, 1979 and before June 30, 1979, Mr. Kirwan stated on the 'hot line':

"Thanks to the efforts of most of you, we had a profitable first quarter in Youngstown."

"i. In further illustration of the action and forbearance induced by Defendant's promise, in detrimental reliance thereon, on or about June 5, 1979 Mr. Kirwan stated to the press that anxiety about the future of the Youngstown District had generated what he termed 'a nonadversarial relationship' between management and the work force.

"j. Because of Defendant's promise and in detrimental reliance thereon, in August 1979 President Reno DePietro of Plaintiff Local 1307 and grievance committeeman Michael Mignogna met with David Houck, an agent of Defendant, to consider how to improve the profitability of the 12 mill at the McDonald Works. Defendant shut down the 12 mill so that DiPietro and Mignogna could meet the crews in the company conference room. DePietro and Mignogna relayed the message from management that if the mills could be kept profitable, they would stay open, and urged the men to work more efficiently. The men told their union representatives about problems in the 12 mill which impeded their work. In September 1979, DePietro and Mignogna met with Will McCorckle and George Benkey, agents of Defendant to discuss the status of the 12 mill. Benkey reported that attitudes were better and production was up.

"k. In October 1979, Robert Griffin, an agent of Defendant, convened the grievance committeeman of Plaintiff Local 1307 and told them that the 18 mill was going

from two turns to one. He asked if management could depart from the previous practice of rotating layoffs among the men in the department, because it would save the company money to lay off the men at the bottom of the seniority list and keep the men at the top of the list at work full time. Defendant's proposal had the effect of reducing the income of Plaintiff Local because fewer men would work the one day per month which requires them to pay union dues. However, because of Defendant's promise and in detrimental reliance thereon, the union representatives agreed to Defendant's proposal.

"l. In further illustration of the action and reliance induced by Defendant's promise, in detrimental reliance thereon, representatives of Plaintiff Locals agreed to a 'power schedule' in the scheduling of turns for the Ohio Works, the 7–17 mill at the McDonald Works, and the 18 mill at the McDonald Works. The purpose of the 'power schedule' was to decrease Defendant's energy cost by shifting personnel from day turn to afternoon turn (3–11 P.M.) so as to equalize the energy consumption of the mills throughout the two turns. This proposal was unpopular with employees because it required them to give up time with their families. Plaintiff Locals could have protested this proposal through the grievance procedure as a departure from normal schedule pattern.

"m. Plaintiff Locals permitted Defendant to combine jobs so as to reduce Defendant's costs, although the previously existing jobs were well established by past practice and Plaintiff Locals could have grieved the changes had management imposed them unilaterally. Such job combinations included: The job of Pump Tender Helper at the Bessemer in the Ohio Works was combined with a job in the blast furnace pumphouse; coal handlers in the 9 Boiler House at the Ohio Works were put into the millwright gang as helpers and thereafter handled coal on an 'as needed' basis; the second man on the Topper Turbine at the Ohio Works was combined with a job at the Boiler House; and the job of inspector of narrow-gauge locomotives in the Diesel Shop was abol-

ished and performed thereafter on an 'as needed' basis by other workers.

"n. Action and forbearance as described, supra, was continuously induced by Defendant through social occasions sponsored by Youngstown District management. In May 1979, newly elected officers of Plaintiff Locals and Youngstown District supervisors were convened at the Mahoning County Country Club, 700 E. Liberty Street, Girard, Ohio, for an affair known as 'A Beer With The Boss.' Mr. Kirwan addressed the group. He described planned improvements in the Sinter Plant and the installation of a new coiler in the 18 mill. He predicted a steel shortage in the mid-1980's and an opportunity at that time for the Youngstown District to make the capital investment needed for longterm viability. In answer to a question from President Vasquez of Plaintiff Local 1330, Mr. Kirwan stated that the investment he had in mind was $250 million for electric furnaces and a continuous caster at the McDonald Works. He also stated that the mills were presently profitable and that the men should keep up their good work. In September 1979, Burning Yard employees were invited to dinner at Sokol Center Restaurant, 850 E. Midlothian Avenue, Youngstown, Ohio, where Mr. Kirwan and Mr. Tkatch congratulated them and told them they had saved their jobs.

"12. Also in detrimental reliance on Defendant's promise, individual Plaintiffs, or some of them, gave up opportunities to take other employment and committed themselves to major, long-term expenditures such as the purchase of homes. By way of illustration:

"a. LeRoy Benson, 455 Utah Avenue, McDonald, Ohio 44437, the first-named individual Plaintiff, had been in the mill ten years as of June 1979. Since his pension became vested at that time he considered whether to seek other employment. His foreman, Thomas Augustine, advised him not to do so because he had a secure future with United States Steel. Accordingly, Mr. Benson gave up the idea of seeking work elsewhere, bought a car

in July 1979, and on October 28, 1979 bought a home.

"b. Frank Georges, R.D. 2, Hillsville Road, Lowelville, Ohio 44436, another individual Plaintiff, bought a new home on November 27, 1979, and heard the news of Defendant's shutdown announcement on the car radio as he drove home from the bank.

"c. Michael Meser, 810 New York Avenue, McDonald, Ohio 44437, another individual Plaintiff, spent considerable time deciding where to send his son Mickey to college. After hearing David Roderick's statement on TV in June 1979, see Paragraph 10 p, *supra*, Mr. Meser decided on Hiram College where tuition was $2,000 a year rather than Youngstown State University where Mickey could have gone tuition free. On the strength of Mr. Roderick's assurance Mr. Meser also decided to buy a new car which he had not done since 1956. On November 21, 1979, he took out a $4,000 loan from the employee credit union."

Based on these allegations, appellant steelworkers make this fundamental assertion which is the heart of the contract claim:

"13. Defendant's promise, and the detrimental reliance thereon of Locals 1330, 1307, 3073, and 3072, and of their members gave rise to a contract between Defendant and Locals 1330, 1307, 3073, and 3072, and their members, that the Ohio and McDonald Works would be kept open if they became profitable."

They also assert that "The Ohio and McDonald works would become profitable."

As we read this lengthy record, and as the District Judge read it, it does not contain any factual dispute over the allegations as to company statements or the responsive actions of steelworkers in relation thereto. It is beyond argument that the local management of U.S. Steel's Youngstown plants engaged in a major campaign to enlist employee participation in an all-out effort to make these two plants profitable in order to prevent their being closed. It is equally obvious that the employees responded wholeheartedly.

The District Judge, however, rejected the promissory estoppel contract theory on three grounds. The first ground was that none of the statements made by officers and employees of the company constituted a definite promise to continue operation of the plants if they did become profitable. The second ground was that the statements relied upon by plaintiffs were made by employees and public relations officers of the company and not by company officers. The third ground was a finding of fact that "The condition precedent of the alleged contract and promise—profitability of the Youngstown facilities—was never fulfilled, and the actions in contract and for detrimental reliance cannot be found for plaintiffs."

The District Judge's fundamental disposition of plaintiffs-appellants' contract claims is stated in this finding of fact:

[T]here is clear evidence to support the company's decision that the plants were not profitable, the various acts of forebearance taken by the plaintiffs do not give them the basis for relief against defendant.

Our examination of this record offers no ground for our holding that this finding of fact is "clearly erroneous." *See* Fed.R. Civ.P. 52(a).

The District Judge's findings on profitability bear quotation in full:

There is a second, independent ground for denying relief under the contract and detrimental reliance theories, and that is the failure of the condition precedent to defendant's liability—the profitability of the Mahoning Valley plants.

Plaintiffs attempted to demonstrate profitability by defining minimum profitability as the "gross profit margin", which William R. Roesch, President and Chief Operating Officer of United States Steel, described as "the revenues minus the variable costs of performing the operation to produce the product." He admitted that "technically, if you are losing money at the gross margin operation, there is no way to make that operation profitable." Plaintiffs then turned to

their exhibits 32 through 37, which were summary sheets of operating profitability for the Youngstown facilities for 1977, 1978, 1979, and 1980. These exhibits revealed that the gross profit margin for 1977 was $24,899,000.00, that for 1978 was $41,770,000.00, that for 1979 was $32,571,-000.00 and that the projected gross profit margin for 1980, as of November 20, 1979, was $32,396,000.00.

These figures do indicate that at the variable-cost margin, the plant was, in a sense, profitable. It should be remembered, however, that even with the projected $32,396,000.00 gross profit margin projected for 1980, the over-all projection for the year was a loss of $9,387,000.00. This suggests that with a different definition of profit, especially one that would include fixed costs, the outcome of an accounting analysis could be made to be nonprofitability. Mr. Roesch testified that the gross profit margin "does not represent the profit of the operation," nor does it represent that the operation is necessarily profitable considered as a whole. He explained that "[t]here are other factors involved because, once you have the gross margin, you have to subtract the depreciation for the equipment which was involved and depreciate it over a period of time; you have to subtract the selling expenses which are necessary; and you have to subtract the administrative charges, the taxes, and so forth." He also explained that, because of the integrated system of the national corporation, many of the unseen costs of the Youngstown Works were absorbed by other plants and operations in the steel company. Mr. Roesch testified that it was primarily the obsolescence of the plant facilities that made the plant unprofitable.

The testimony of David Roderick, Chairman of the Board of Directors and Chief Executive Officer of United States Steel, confirmed Mr. Roesch's opinion. In answer to the question "And through the end of October, 1979, Youngstown [sic] the performance of that year was in the area of about the break even, was it not?" Mr. Roderick replied ". . . the actu-al number was about a $300 thousand loss, as of the end of October, cumulative for the year. And further, as I recall, they had lost money three out of the four months preceding it." Further, Mr. Roderick explained the opinion of the Board of Directors on the trend of the loss in this way:

Well, what I really mean by an irreversible loss is based on our best judgment, or my best judgment, the loss would be incurred and there was nothing the plant could do to avoid that loss, that the market was working negatively and that it was our projection that the plant would lose money in five out of six months of the second half, that the loss for the year would be quite substantial in 1979, and with all the facts that we could see on the horizon for 1980, plus the actual performance for the second half of 1979, we felt there was no way that the loss trend could be reversed for the calendar year of 1980.

This Court is loath to exchange its own view of the parameters of profitability for that of the corporation. It is clear that there is little argument as to the production figures for the Youngstown mills—the controversy surrounds the interpretation of those figures. Plaintiffs read the figures in light of a gross profit margin analysis of minimum profitability. Defendant sees capital expenditure, fixed costs and technical obsolescence as essential ingredients of the notion of profitability. Perhaps if this Court were being asked to interpret the word "profit" in a written contract between plaintiffs and defendant, some choice would have to be made. Given the oral nature of the alleged promises in the case at bar and the obvious ambiguity of the statements made, this Court finds that there is a very reasonable basis on which it can be said that Youngstown facilities were not profitable. Further, plaintiffs have made no showing of bad faith on the part of the Board of Directors in the Board's determination of profitability, nor have they given any grounds to suggest that

defendant's definition of profitability is an unrealistic or unreasonable one. The condition precedent of the alleged contract and promise—profitability of the Youngstown facilities—was never fulfilled, and the actions in contract and for detrimental reliance cannot be found for plaintiffs.

As noted above, our standard of review of findings of fact of the District Court is set forth in Rule 52(a) of the Federal Rules of Civil Procedure, which provides, "findings of fact shall not be set aside unless clearly erroneous and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses."

We believe that this record demonstrates without significant dispute that the profitability issue in the case depends in large part upon definition. The plaintiffs wish to employ the direct costs of operating the two plants, compared to the total selling price of their products. The difference, they contend, is "profit." This formula would eliminate such charges as corporate purchasing and sales expense allocable to the Youngstown plants, and allocable corporate management expenses including, but not limited to marketing, engineering, auditing, accounting, advertising. Obviously, any multiplant corporation could quickly go bankrupt if such a definition of profit was employed generally and over any period of time.

Plaintiffs-appellants point out, however, that this version of Youngstown profitability was employed by the Youngstown management in setting a goal for its employees and in statements which described achieving that goal. The standard of Restatement (Second) of Contracts § 90, upon which plaintiffs-appellants rely, however, is one of reasonable expectability of the "promise" detrimentally relied upon. The District Judge did not find, nor can we, that reliance upon a promise to keep these plants open on the basis of coverage of plant fixed costs was within reasonable expectability. We cannot hold that the District Judge erred legally or was "clearly erroneous" in his fact finding when he held that the "promise" to keep the plants open had to be read in the context of normal corporate profit accounting and that profitability had not been achieved.

Complete analysis of plaintiffs-appellants' promissory estoppel claims against the background of the collective bargaining agreement and Section 301 of the National Labor Relations Act would be a formidable task. We decline to undertake it, however, since even if we decided those issues favorably to plaintiffs, we would nonetheless be forced to decide the contract claim adversely to them because of failure to prove profitability.

## III.  THE COMMUNITY PROPERTY CLAIM

■ At a pretrial hearing of this case on February 28, 1980, the District Judge made a statement at some length about the relationship between the parties to this case and the public interest involved therein. He said:

> Everything that has happened in the Mahoning Valley has been happening for many years because of steel. Schools have been built, roads have been built. Expansion that has taken place is because of steel. And to accommodate that industry, lives and destinies of the inhabitants of that community were based and planned on the basis of that institution: Steel.

>     *     *     *     *     *     *

> We are talking about an institution, a large corporate institution that is virtually the reason for the existence of that segment of this nation [Youngstown]. Without it, that segment of this nation perhaps suffers, instantly and severely. Whether it becomes a ghost town or not, I don't know. I am not aware of its capability for adapting.

>     *     *     *     *     *     *

> But what has happened over the years between U.S. Steel, Youngstown and the inhabitants? Hasn't something come out of that relationship, something that out of which—not reaching for a case on property law or a series of cases but looking at the law as a whole, the Consti-

tution, the whole body of law, not only contract law, but tort, corporations, agency, negotiable instruments—taking a look at the whole body of American law and then sitting back and reflecting on what it seeks to do, and that is to adjust human relationships in keeping with the whole spirit and foundation of the American system of law, to preserve property rights.

\*      \*      \*      \*      \*      \*

It would seem to me that when we take a look at the whole body of American law and the principles we attempt to come out with—and although a legislature has not pronounced any laws with respect to such a property right, that is not to suggest that there will not be a need for such a law in the future dealing with similar situations—*it seems to me that a property right has arisen from this lengthy, long-established relationship between United States Steel, the steel industry as an institution, the community in Youngstown, the people in Mahoning County and the Mahoning Valley in having given and devoted their lives to this industry.* Perhaps not a property right to the extent that can be remedied by compelling U.S. Steel to remain in Youngstown. But *I think the law can recognize the property right to the extent that U.S. Steel cannot leave that Mahoning Valley and the Youngstown area in a state of waste, that it cannot completely abandon its obligation to that community, because certain vested rights have arisen out of this long relationship and institution.*

Subsequently thereto, steelworkers' complaint was amended, realleging the first cause of action, paragraphs 1–49, claiming pendent jurisdiction over claims arising out of the laws of the State of Ohio and asserting as follows:

52. A property right has arisen from the long-established relation between the community of the 19th Congressional District and Plaintiffs, on the one hand, and Defendant on the other hand, which this Court can enforce.

53. This right, in the nature of an easement, requires that Defendant:

a. Assist in the preservation of the institution of steel in that community;

b. Figure into its cost of withdrawing and closing the Ohio and McDonald Works the cost of rehabilitating the community and the workers;

c. Be restrained from leaving the Mahoning Valley in a state of waste and from abandoning its obligation to that community.

This court has examined these allegations with care and with great sympathy for the community interest reflected therein. Our problem in dealing with plaintiffs' fourth cause of action is one of authority. Neither in brief nor oral argument have plaintiffs pointed to any constitutional provision contained in either the Constitution of the United States or the Constitution of the State of Ohio, nor any law enacted by the United States Congress or the Legislature of Ohio, nor any case decided by the courts of either of these jurisdictions which would convey authority to this court to require the United States Steel Corporation to continue operations in Youngstown which its officers and Board of Directors had decided to discontinue on the basis of unprofitability.

This court has in fact dealt with this specific issue in *Charland v. Norge Division, Borg-Warner Corp.,* 407 F.2d 1062 (6th Cir.), cert. denied, 395 U.S. 927, 89 S.Ct. 1786, 23 L.Ed.2d 245, *rehearing denied,* 396 U.S. 871, 90 S.Ct. 44, 24 L.Ed.2d 128 (1969). The case was, as appellants point out, substantially different from the present complaint in that there was a single individual plaintiff involved. He was, however, one of many Norge employees who had been thrown out of work by the removal of the Norge Muskegon Heights plant to Fort Smith, Arkansas. As is true in this case, there was a union contractual agreement for very limited severance pay. The union at the Norge plant in Muskegon Heights had succeeded in negotiating some severance pay and "very limited removal rights to Fort Smith." Appellant Charland refused to accept the union-negotiated removal agreement. We recite his position as follows:

Appellant does not by any means limit his petition for relief to § 301 contract rights. He tells us, in effect, I worked 30 years for defendant Norge. At the end I am thrown out of a job unless I move hundreds of miles to another city and start as a new employee behind hundreds of local residents and without either accumulated seniority or pension rights. In the alternative if I sign a complete release of all rights arising out of my job, I get $1,500. This is fundamentally unfair. And it is a deprivation of my property rights in my job in violation of Article V of the United States Constitution.

*Charland v. Norge Division, Borg-Warner Corp., supra* at 1064.

This court's response to Charland's claims bears repetition here:

Article V of the Constitution, of course, makes no mention of employment. But it (and the Fourteenth Amendment) does prohibit deprivation of property without due process of law. Thus appellant's assumption submits the fundamental question of whether or not there is a legally recognizable property right in a job which has been held for something approaching a lifetime.

The claim presented by this appellant brings sharply into focus such problems as unemployment crises, the mobility of capital, technological change and the right of an industrial owner to go out of business. *See Textile Workers Union of America v. Darlington Manufacturing Co.*, 380 U.S. 263, 85 S.Ct. 994, 13 L.Ed.2d 827 (1965). Thus far federal law has sought to protect the human values to which appellant calls our attention by means of such legislation as unemployment compensation, 42 U.S.C. §§ 1400–1400v (1964), and social security laws, 42 U.S.C. ch. 7 (1964), as amended, (Supp. III, 1965–67). These statutes afford limited financial protection to the individual worker, but they assume his loss of employment.

Whatever the future may bring, neither by statute nor by court decision has appellant's claimed property right been recognized to date in this country. The closest approach in case law is the now

overruled *Zdanok* [*Zdanok v. Glidden Co.*, 288 F.2d 99 (2nd Cir.)] case. But even it was founded upon a construction of the labor-management contract which is not available in the instant case. And even the most enthusiastic supporters of the *Zdanok* decision rely upon the labor-management agreement as the source of legal authority for seniority rights. *See*, e. g., Blumrosen, Seniority Rights and Industrial Change: *Zdanok v. Glidden Co.*, 47 Minn.L.Rev. 505 (1963). Needless to say, if the United States Supreme Court wishes now to reconsider and expand the view of seniority which it expressed in *Ford Motor Co. v. Huffman*, 345 U.S. 330, 73 S.Ct. 681, 97 L.Ed. 1048 (1953), this case offers a vehicle.

*Id.* at 1065.

Appellants, however, cite and rely upon a decision of the Supreme Court of the United States, *Munn v. Illinois*, 94 U.S. 113, 24 L.Ed. 77 (1877), claiming "that a corporation affected by the public interest, which seeks to take action injurious to that interest, may be restrained from doing so by the equitable powers of a court of law." This case does represent a fundamental statement of the power of the legislative branch of government over private business and private property. It pertained to the question as to whether or not the General Assembly of Illinois could, within the federal commerce clause and the due process clause of the Federal Constitution, "Fix by law the maximum of charges for the storage of grain in warehouses at Chicago and other places in the State having not less than one hundred thousand inhabitants." Justice Waite held that no federal constitutional principle was violated by the state legislative enactment.

The case is undoubtedly important precedent establishing power on the part of state legislatures to regulate private property (particularly public utilities) in the public interest. It cannot, however, properly be cited for holding that federal courts have such legislative power in their own hands.

We recognize that plaintiffs rely upon one sentence: "So, too, in matters which do

affect the public interest, and as to which legislative control may be exercised, if there are no statutory regulations upon the subject, the courts must determine what is reasonable. The controlling fact is the power to regulate at all. If that exists, the right to establish the maximum of charge, as one of the means of regulation, is implied." *Id.* at 134, 24 L.Ed. 77. This dictum was laid down in connection with an enterprise which the court treated as essentially a public utility. We find no ground to extend it to assert judicial power to order a steel manufacturing corporation to continue the operation of two plants which it (and a District Court on competent evidence) have found to be unprofitable.

The problem of plant closing and plant removal from one section of the country to another is by no means new in American history. The former mill towns of New England, with their empty textile factory buildings, are monuments to the migration of textile manufacturers to the South, without hindrance from the Congress of the United States, from the legislatures of the states concerned, or, for that matter, from the courts of the land.

■ In the view of this court, formulation of public policy on the great issues involved in plant closings and removals is clearly the responsibility of the legislatures of the states or of the Congress of the United States.[5] *Nebbia v. New York*, 291 U.S. 502, 537–39, 54 S.Ct. 505, 516, 78 L.Ed. 940 (1934).

We find no legal basis for judicial relief as to appellants' fourth cause of action.

## IV. THE ANTITRUST CLAIM

Finally, appellants contend that the United States Steel Corporation has violated federal antitrust laws, 15 U.S.C. § 1 *et seq.* (1976). The essence of the antitrust complaint is that defendant United States Steel Corporation has refused to sell to the plaintiffs the Ohio and McDonald works which it seeks to abandon. Plaintiffs claim defendant has thus "exercised monopoly power"

for the purpose of preventing a potential competitor from entering the steel market.

Steelworkers' reply brief contends that:

U.S. Steel has now four times refused to deal with Steelworkers: first, when Chairman of the Board Roderick stated on January 31, 1980, in response to a question about Steelworkers' hope of buying the Youngstown Works, that the company would not sell to a subsidized competitor; second, when a representative of U.S. Steel's Realty Division told Steelworkers on February 14, 1980, that the property was not for sale to them; third, when Mr. Roderick testified to the same effect, and fourth, when Mr. Roderick formally communicated this position to Steelworkers by letter of April 18, 1980

· · ·

Steelworkers also contend on this issue that they have been denied their day in court on their antitrust claim.

■ Out of perhaps an excess of caution, we vacate the District Court judgment dismissing appellants' antitrust claim. We agree with the District Judge that as of the date of his order dismissing this aspect of the complaint, he did not have before him any binding offer to purchase the Youngstown plants of United States Steel. Appellants contend, however, that they were caught by surprise by the District Judge's sudden demand for their antitrust proofs or in lieu thereof a complete offer to prove the existence or early prospect of such an offer. They also argue, in effect, that the District Judge did not take into account their contention that the antitrust violation they charge against United States Steel—the public announcement by its President of a flat refusal to sell to any "subsidized" purchasers—helped make impossible the formulation of such an offer.

United States Steel's implied claim that it can, consistent with federal antitrust laws, refuse to do business with a corporation which has been aided, directly or indirectly

---

**5.** See Appendix A for a description of a bill introduced in the Senate by Senator Riegle dealing with plant closings.

by the United States government through the operation of duly adopted law, is unique in this court's experience. Nor has our research served to date to disclose any legal precedent for such a position. The ramifications of this refusal would be far-reaching. Could United States Steel, in the event the Chrysler Corporation sought to manufacture some portion of its own steel needs, refuse to sell steel to that corporation because of the massive aid which the federal government has seen fit to supply to Chrysler?[6] These questions are not ones which this court is in a position to answer on this record. The issue as to whether or not there has been a flat refusal to deal with plaintiffs on the basis alleged should be the subject of trial testimony. The antitrust issue which we perceive as arguable should be the subject of briefing, argument and trial court decision before consideration by this court.

Summary judgment in antitrust matters is not favored absent a clarity of fact and law not apparent here. *Poller v. Columbia Broadcasting*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962).

The judgment previously entered by the District Court is affirmed in all respects except as to plaintiffs-appellants' antitrust claim. The judgment of the District Court on that issue is vacated and remanded for further proceedings. The stay previously entered in the interest of appellate review is vacated as of five business days after the date of this opinion, unless the Supreme Court of the United States, or a Justice thereof, continues same in the meantime.

### APPENDIX A

CONGRESSIONAL RECORD

PROCEEDINGS AND DEBATES OF THE
96TH CONGRESS, FIRST SESSION

Vol. 125     Washington, Tuesday, July 31, 1979     No. 107

*Senate*

By Mr. RIEGLE:

S. 1608. A bill to require business concerns which undertake changes of operations to give notice to the Secretary of Labor, and to affected labor organizations, employees, and local governments; to require business concerns to provide assistance to employees who suffer an employment loss caused by changes of operations; to authorize the Secretary of Labor to provide assistance to such business concerns, and to such affected employees and local governments, and for other purposes; to the Committee on Labor and Human Resources.

### NATIONAL EMPLOYMENT PRIORITIES ACT OF 1979

Mr. RIEGLE. Mr. President, today I am introducing the National Employment Priorities Act of 1979, which addresses the growing problem of large-scale plant closings and relocations across the country. This bill, which is also being introduced today in the House of Representatives by Representative William Ford from my home State of Michigan, is designed to assure that large corporations take into account the interests of long-time workers and of communities when they consider closing or relocating large plants.

In today's complex society, major economic decisions by large employers have far-reaching effects on the workers who have put years into their jobs, and on the communities whose economic base is so dependent on private industry. These corporate decisions should take into account their external social and economic effects on workers and on their local communities.

Mr. President, earlier proposals for dealing with plant closings and relocations have commonly focused on establishing a procedure for the Federal Government to determine which closings or relocations are economically justified and which are not. I do not believe that the Government should

---

**6.** As to this issue, we note that in *Nebbia v. New York*, 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940 (1934), the Supreme Court held: "Moreover, the state or a municipality may itself enter into business in competition with private proprietors, and thus effectively although indirectly control the prices charged by them." *Id.* at 529–30, 54 S.Ct. at 513 (footnote omitted); *Youngstown Co. v. Sawyer*, 343 U.S. 579, 588–89, 630–31, 72 S.Ct. 863, 867, 886–7, 96 L.Ed. 1153 (1952) (Douglas, J., *concurring*).

make this determination. Under the bill I am introducing today, business concerns would continue to make these basic economic decisions on their own, taking into account their impact on the workers and communities with so great a stake in the outcome of these decisions.

The heart of the National Employment Priorities Act is a requirement that workers, local communities, and the Government receive prenotification of impending plant closings or relocations. In addition, workers who lose their jobs as a result of these major employment disruptions would receive partial payments and continued benefits from their employer for a year, reduced by any unemployment compensation, trade adjustment assistance, or outside earnings they may receive.

This bill would also help forestall employment disruptions. Federal assistance for employee buyouts of plants targeted for shutdown, economic assistance to companies which might otherwise be forced to close, and help for local governments adversely affected by plant closings would help to alleviate these problems. Targeted Federal training programs would also help displaced workers find new jobs.

As a member of the Labor and Human Resources Committee, I am vitally interested in the success of this legislation, but I am even more interested as the senior Senator from Michigan. Our State is facing the awful picture of some 10,000 Chrysler workers possibly losing their jobs at the "Dodge Main" plant in Detroit next year.

What kind of feelings can these families have when the rug is suddenly pulled out from under them, and they have no new job to go to? The recession is already at work in Michigan, and there are not any jobs left there. Last week, General Motors laid off 1,200 workers temporarily, so how can workers who lose their jobs permanently have any hope when this is going on?

The "Dodge Main" and other autoworkers are protected to a point, but the plant shutdown problem is extremely serious to smaller plants and communities. Take the Chrysler Lyons trim plant—hundreds of workers and their families affected there when the town's largest industry suddenly quit. Another example is the Lazy Boy Chair Co. in Monroe, where 1,900 workers were suddenly put on the street. Another similar example can be found in Livonia, where workers—again in hundreds—have lost their pensions because their employer decided to shut down a plant and move elsewhere. My office is involved in their case, but we need this legislation so that all agencies can get involved automatically, ahead of time, to forestall the problems the workers will face when they become unemployed.

Plant closing announcements in Michigan and elsewhere have become too common and predictable these days. Without fail, a company leaving town cites adverse economic conditions as their reason for leaving jobless workers and empty, gutted buildings behind. What could be more adverse than the grim economic conditions they leave behind for workers and their families. They still have a home, food, education to pay for. They have a family life suddenly disrupted. Hardworking men and women have to swallow their pride and ask for help. But before they have to ask—before a plant has to leave town and disrupt their lives and possibly entire communities—let us give them that help.

I am pleased to note that the Chairman of the Labor and Human Resources Committee (Mr. Williams) is extremely interested in the desperate need to assure that economic decisions concerning plant closings and relocations take into account the interests of workers and communities. In the coming months, the committee will be holding an extensive series of hearings on this subject, and on effective ways of alleviating this severe national problem.

I ask unanimous consent that the text of the National Employment Priorities Act and a section-by-section analysis be printed in the Record at this point.

There being no objection, the bill and summary were ordered to be printed in the Record, as follows:

SECTION–BY–SECTION SUMMARY

Sec. 1. Short Title; Table of Contents.

Sec. 2.   Findings and Purpose.

Sec. 3.   Definitions.

Sec. 4.   Notice of Intent to Change Operations.—

Requires business concerns intending to undertake changes of operations causing employment losses for 100 employees or 15 percent of the workforce at an establishment, whichever is less, to notify the employees, any affected labor organizations, the Secretary of Labor, and local governments—

(1) at least 2 years in advance, if 500 employees or more will be affected;

(2) at least 18 months in advance, if from 100 to 500 employees will be affected;

(3) at least 6 months in advance, if fewer than 100 employees (but more than 15 percent of an establishment) will be affected.

Sec. 5.   Investigation of Intended Change of Operations.—

Authorizes the Secretary of Labor to hold investigations into the economic reasons for the change of operations, the estimated extent of economic or social loss to employees and local governments, the feasibility of preventing or minimizing employment losses by modification of product lines and production techniques, and recommendations of local governments, labor organizations, and others to prevent or alleviate such losses.

Sec. 6.   Report of Investigation.—

Instructs the Secretary of Labor to issue a report summarizing the findings and recommendations resulting from such investigations, including a description of the nature and extent of assistance which would be required to prevent or minimize losses.

Sec. 7.   Ineligibility of certain employees for assistance.—

Disqualifies employees who entered employment after notice of the intended change of operations, if they were informed of the intended change.

Sec. 8.   Notice of Employment Status.—

Requires business concerns suspending or terminating employment or reducing below 85 percent the wages of an employee as a result of a covered change of operations to notify such employee whether reemployment will be offered within 26 weeks. If reemployment is not pledged, the employee becomes eligible for assistance. If reemployment is pledged but not provided within 26 weeks, the employee receives lump-sum back benefits for the 26 week period and becomes eligible for assistance at the end of the 26 weeks.

Sec. 9.   Transitional Assistance by Business Concerns.—

Requires business concerns to pay eligible employees 52 weeks of income maintenance payments equal to 85 percent of their previous weekly wage (or 100 percent if such employees are participating in approved training programs to prepare them for other employment) and to continue their benefits. Payments are reduced for outside earnings, unemployment compensation, and trade adjustment assistance, and are capped at $25,000 for 52-week period. No payments are required to employees who refuse comparable employment or who fail to participate satisfactorily in training or placement programs. Relocation assistance is required for transferred employees. Workers near retirement age receive payments for longer periods (depending on their age), with the federal government reimbursing companies for such extended payments.

Sec. 10.   Secondary Liability.—

Provides that a company cannot escape liability for such payments by selling off plants scheduled for shutdown.

Sec. 11.   Transfer of Employees.—

Requires companies to offer transfers within 3-year period to affected employees if comparable employment is available at other establishments of such company, to the extent such transfers do not violate collective bargaining agreements.

Sec. 12.   Employee Benefit Plans.—

Continues coverage under employee benefit plans for period of income maintenance payments, and vests pension rights for workers with 5 years coverage who suffer eligible employment losses. Authorizes early retirement at reduced pensions for workers 55 and over.

Sec. 13. Federal Assistance to Employees.—

Instructs Secretary of Labor to conduct training programs, job placement services, relocation assistance, and job search assistance for eligible employees, through existing as well as new programs, after consultation with management and labor.

Sec. 14. Related Retraining Assistance to Employees.—

Authorizes programs of retraining to enable employees to perform new employment tasks to avert plant closings.

Sec. 15. Eligibility of Business Concerns for Assistance.—

Provides that companies intending to change operations may submit a request for assistance if their resources would be inadequate to prevent the employment losses and such assistance would enable the companies to operate the establishments on an improved economic basis within a reasonable period of time.

Sec. 16. Assistance to Business Concerns.—

Authorizes the Secretary of Labor to provide loans, loan guarantees, and interest subsidies to eligible businesses, plus technical assistance including research and development in connection with new production or marketing techniques to create new employment opportunities.

Sec. 17. Targeted Federal Procurement.—

Authorizes the Secretary of Labor to issue a certificate of procurement credit to companies able to avert employment losses through federal procurement. contracts, which will discount such companies bids by 5 percent.

Sec. 18. Eligibility of Local Governments for Assistance.—

Provides that local governments suffering a substantial decrease in tax revenue, a substantial increase in the demand for social services, or a substantial increase in unemployment are eligible for assistance.

Sec. 19. Assistance to Local Governments.—

Authorizes the Secretary of Labor to provide grants, loans, and loan guarantees to eligible local governments for providing social services and implementing public works projects, giving priority to public works projects in geographical areas of high unemployment which will make such areas more attractive for commercial investment, cause long-term increase in employment opportunities, provide an efficient means of increasing employment, and further other national goals such as improving environmental quality and increases [sic] energy development and conservation.

Sec. 20. Eligibility of Other Employers and of Cooperative Associations of Employees for Assistance.—

Provides that employers or cooperative employee associations are eligible for assistance if they will create or expand employment opportunities over a substantial period of time and substantial equivalent assistance is not otherwise available.

Sec. 21. Assistance to Other Employers and to Cooperative Associations of Employees.—

Authorizes the Secretary of Labor to provide loans, loan guarantees, and technical assistance for expanding operations at or acquiring ownership of plants undergoing a covered change of operations, for constructing new establishments, or for undertaking research and development projects to identify new markets and new production and marketing techniques.

Sec. 22. Priority for Providing Assistance.—

Gives priority to operations with a reasonable likelihood of providing continuous employment over a substantial period of time.

Sec. 23. Liability for Loss of Revenue.—

Requires companies to pay local governments 85 percent of the tax revenue lost over the first complete taxable year after a covered change of operations. In the case of a transfer of operations outside of the United States where the Secretary of Labor finds an economically viable alternative to such transfer existed, the company will be

liable to the United States for 300 percent of the tax loss resulting from such transfer.

Sec. 24. Criminal Violations and Penalties.—

Provides penalties of up to $1,000 or 1 year in jail or both for knowingly making false statements or failing to disclose material facts for the purpose of obtaining assistance under this Act. Provides penalties of up to $10,000 or 5 years in jail or both for failing to give notice of [sic] knowingly making false statements of material fact or failing to disclose material facts required to be disclosed under this Act.

Sec. 25. Civil Violations and Penalties.—

Provides civil penalties for other violations of the Act equal to investment tax credits, deductions or depreciation, business expense deductions, half the value of economic benefits from foreign countries, and reduced wages and unemployment taxes related to establishments undergoing covered changes of operations.

Sec. 26. Violations of Employees' Rights.—

Prohibits discrimination against employees because of their exercise of rights or participation in activities under this Act.

Sec. 27. Recovery of Overpayments.—

Authorizes the Secretary of Labor to recovery (through reduced or withheld assistance or otherwise) overpayments resulting from false statements or concealed material facts.

Sec. 28. Reserves; Recording Requirements Relating to Loans.—

Instructs the Secretary of Labor to maintain operating reserves and to record mortgages in accordance with state law.

Sec. 29. Congressional Disapproval of Rules.—

Provides for invalidation of proposed rules through adoption of a concurrent resolution within 30 days following their proposal.

Sec. 30. Reports; Legislative Proposals.—

Instructs the Secretary of Labor to evaluate and report upon the effectiveness of programs after 3 years of operations and to prepare proposals for legislation to provide assistance to local governments and to require business concerns to report employment opportunities for inclusion in a nationwide computerized job bank and matching program under CETA.

Sec. 31. General Powers of Secretary.—

Sec. 32. Implementation of Employment Policies Through National Employment Priorities Administration.—

Authorizes the Secretary of Labor to delegate functions to the National Employment Priorities Administration.

Sec. 33. National Employment Priorities Administration.—

Establishes a National Employment Priorities Administration within the Department of Labor.

Sec. 34. National Employment Priorities Advisory Council.—

Establishes a National Employment Priorities Advisory Council of 15 government, labor, business, and public members.

Sec. 35. Amendments to Other Laws.

Sec. 36. Authorization of Appropriations.—

Authorizes such sums as may be necessary.