**D & G STOUT, INCORPORATED, formerly known as General Liquors, Incorporated, Plaintiff–Appellant,**

v.

**BACARDI IMPORTS, INCORPORATED, Defendant–Appellee.**

No. 89–3596.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 14, 1990.

Decided Jan. 31, 1991.

Franklin A. Morse, II, Barnes & Thornburg, South Bend, Ind., for plaintiff-appellant.

Timothy W. Woods, Jones, Obenchain, Ford, Pankow & Lewis, South Bend, Ind., for defendant-appellee.

Before CUDAHY, POSNER and FLAUM, Circuit Judges.

CUDAHY, Circuit Judge.

D & G Stout, Inc., operating at all relevant times under the name General Liquors, Inc. (General), was distributing liquor in the turbulent Indiana liquor market in 1987. When two of its major suppliers jumped ship in early 1987, General faced a critical dilemma: sell out at the best possible price or continue operating on a smaller scale. It began negotiating with another Indiana distributor on the terms of a possible sale. Bacardi Imports, Inc. (Bacardi), was still one of General's remaining major suppliers. Knowing that negotiations were ongoing for General's sale, Bacardi promised that General would continue to act as Bacardi's distributor for Northern Indiana. Based on this representation, General turned down the negotiated selling price it was offered. One week later, Bacardi withdrew its account. Realizing it could no longer continue to operate, General went back to the negotiating table, this time settling for an amount $550,000 below the first offer. The question is whether General can recover the price differential from Bacardi on a theory of promissory estoppel. The district court believed that as a matter of law it could not, and entered summary

judgment for defendant Bacardi. We disagree, and so we remand for trial.

## I.

General was (and D & G Stout, Inc., is) an Indiana corporation with its main place of business in South Bend. Bacardi is a corporation organized in New York and doing business primarily in Miami, Florida. General served at Bacardi's will as its wholesale distributor in Northern Indiana for over 35 years. During the 1980s, liquor suppliers in Indiana undertook an extensive effort to consolidate their distribution, the effect of which was to reduce the number of distributors in the state from approximately twenty in 1980 to only two in 1990.

General weathered the storm until April 1987, when two of its major suppliers withdrew their lines, taking with them the basis of more than fifty percent of General's gross sales. By June, General recognized that it must choose between selling out and scaling back operations in order to stay in business. Despite the recent setbacks, General calculated that remaining operational was possible as long as it held on to its continuing two major suppliers, Bacardi and Hiram Walker.

About this time (and probably in connection with the same forces concentrating distribution) Bacardi lost its distributor in Indianapolis and southern Indiana. Bacardi decided to convene a meeting on July 9, 1987, of applicants for the open distributorship. General's president, David Stout, attended the meetings as an observer, with no designs on the new opening. Stout did intend to seek assurances from Bacardi about its commitment to General in Northern Indiana. While in Indianapolis, Stout was approached by National Wine & Spirits Company (National), which expressed an interest in buying General. Stout agreed to begin negotiations the following weekend. Stout also received the assurances from Bacardi he sought: after listening to Stout's concerns and hearing about his contemplated sale of General, Bacardi emphatically avowed that it had no intention of taking its line to another distributor in Northern Indiana. This promise was open-ended—no one discussed how long the continuing relationship might last.

During the ensuing two weeks, General carried on negotiations with National to reach a price for the purchase of General's assets. Bacardi kept in close contact with General to find out whether it would indeed sell. The negotiations yielded a final figure for Stout to consider. On July 22 and again on July 23—with negotiations concluded and only the final decision remaining—Stout again sought assurances from Bacardi. The supplier unequivocally reconfirmed its commitment to stay with General, and Stout replied that, as a result, he was going to turn down National's offer and would continue operating. Later on the 23rd, Stout rejected National's offer. That same afternoon, Bacardi decided to withdraw its line from General.

General learned of Bacardi's decision on July 30. The news spread quickly through the industry, and by August 3, Hiram Walker had also pulled its line, expressing a belief that General could not continue without Bacardi on board. By this time, sales personnel were abandoning General for jobs with the two surviving distributors in Indiana (one of which was National). General quickly sought out National to sell its assets, but National's offer was now substantially reduced. The ensuing agreement, executed on August 14 and closed on August 28, included a purchase price $550,000 lower than the one National offered in mid-July. Stout's successor company brought suit under the diversity jurisdiction against Bacardi, claiming that the supplier was liable by reason of promissory estoppel for this decline in the purchase price. Judge Miller entered summary judgment for Bacardi, holding that the promises plaintiff alleged were not the type upon which one may rely under Indiana law. Plaintiff appeals.

## II.

We have generally stated General's version of the facts, many of which are undisputed. On appeal, Bacardi does not argue the facts and is apparently willing to rest

on Judge Miller's legal analysis. Both parties also agree with Judge Miller that Indiana law governs this case and we do not question this conclusion. Before us then is the legal question whether the plaintiff has alleged any injury which Indiana's law of promissory estoppel redresses.

Indiana has adopted the Restatement's theory of promissory estoppel:

> A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee and a third person and which does induce such action or forbearance is binding if injustice can be avoided only by the enforcement of the promise. The remedy for breach may be limited as justice requires.

*Restatement (Second) of Contracts* § 90(1) (1981); *Eby v. York–Division, Borg–Warner*, 455 N.E.2d 623, 627 (Ind.App.1983); *Pepsi–Cola General Bottlers, Inc. v. Woods*, 440 N.E.2d 696, 698 (Ind.App.1982). The district judge dismissed the complaint on the ground that Bacardi's alleged promise was not one on which it should reasonably have expected General to rely.

The district court first noted that the relationship between General and Bacardi had always been terminable at will. Because Bacardi's promises that it would continue to use General as its distributor contained no language indicating that they would be good for any specific period,[1] the court reasoned that the relationship remained terminable at will. It then concluded that the promise was not legally enforceable, and thus was not one on which General reasonably might rely. We agree with each of these conclusions but the last. Notwithstanding the continuation of an at-will relationship between Bacardi and General, the promises given between July 9 and July 23 were not without legal effect.

In Indiana, as in many states, an aspiring employee cannot sue for lost wages on an unfulfilled promise of at-will employment.

*Pepsi–Cola*, 440 N.E.2d 696; *accord Ewing v. Board of Trustees of Pulaski Memorial Hosp.*, 486 N.E.2d 1094, 1098 (Ind.App. 1985) (employment contract for indefinite tenure is unenforceable for future employment). Because the employer could have terminated the employee without cause at any time after the employment began, the promise of a job brings no expectation of any determinable period of employment or corresponding amount of wages. The promise is therefore unenforceable under either a contract or a promissory estoppel theory in an action for lost wages. Nevertheless, lost wages are not the only source of damages flowing from a broken promise of employment, enforceable or not. Indiana courts acknowledge certain damages as recoverable when the employer breaks a promise of employment, even if the employment is to be terminable at will. For example, in *Eby v. York–Division, Borg–Warner*, 455 N.E.2d at 627, a plaintiff who gave up a job and moved from Indiana to Florida on a promise of employment sued for recovery of preparation and moving expenses incurred on the basis of the promise. The Indiana appellate court reversed the lower court's summary judgment for the defendant employer, holding that the plaintiff employee had stated a cause of action for promissory estoppel. The court found that the defendant could have expected the plaintiff and his wife to move in reliance on the promise of employment and therefore might be liable for reneging. *See also Pepsi–Cola*, 440 N.E.2d 696; *accord Lorson v. Falcon Coach*, 214 Kan. 670, 522 P.2d 449 (1974).

Our review of Indiana law thus leaves us a simple if somewhat crude question: are the damages plaintiff seeks here more like lost future wages or like moving expenses? We can better answer the question if we determine why Indiana draws this distinction. Unlike lost wages, moving expenses represent out-of-pocket losses; they involve a loss of something already possessed. It would be plausible, although not very so-

---

**1.** Given the context of the promise, we see a plausible argument that the promise was one for a term, namely that Bacardi would stay on at least until the rush toward consolidation passed. But the district judge found differently, and we need not question his factual conclusion in light of our legal analysis.

phisticated, to distinguish between the loss of something yet to be received and the loss of something already in hand. But this is not precisely where Indiana draws the distinction, nor where we would draw it if it were our choice to make. *Eby* itself involved not only moving expenses, but wages lost at plaintiff's old job during the few days plaintiff was preparing to move. 455 N.E.2d at 625. Those wages were not out-of-pocket losses: plaintiff had no more received those wages than he had received wages from his promised employment.

In fact, the line Indiana draws is between expectation damages and reliance damages. In future wages, the employee has only an expectation of income, the recovery of which promissory estoppel will not support in an at-will employment setting. In wages forgone in order to prepare to move, as in moving expenses themselves, the employee gave up a presently determinate sum for the purpose of relocating. Both moving expenses and forgone wages were the hopeful employee's costs of positioning himself for his new job; moving expenses happen to be out-of-pocket losses, while forgone wages are opportunity costs. Both are reliance costs, not expectancy damages.

Thus, the question has become whether the loss incurred from the price drop was attributable to lost expectations of future profit or resulted from an opportunity forgone in reliance on the promise. At first blush, the injury might seem more like the loss of future wages. Bacardi was a major supplier whose business was extremely valuable to General. While the loss of this "asset" might cause a decline in General's market value as measured by the loss of future income from the sale of Bacardi's products, this loss is not actionable on a promissory estoppel theory. Those damages would presumably be measured by the present value of General's anticipated profit from the sale of Bacardi's products, and Indiana will not grant relief based on promissory estoppel to compensate an aggrieved party for such expectancy damages. Lost future income expected from an at-will relationship, whether from wages or from profits, is not recoverable on a theory of promissory estoppel, and neither is the present value of such losses.

But the fact is that recovery of lost profits is not a question before us. Bacardi's account was never an "asset" that National could acquire by purchasing General. As counsel for the defendant candidly but carefully explained, National never assumed that it would retain the Bacardi account by buying General; in fact, National assumed the opposite. Bacardi's major competitor in the rum distilling business distributed through National, and the two top distillers in a given category of liquor would not choose the same distributor. Both before and after Bacardi decided to withdraw its products, all National wanted from General were its assets other than the Bacardi account. But Bacardi's repudiation of its promise ostensibly affected the price of General's business so drastically because, as everyone in the industry understood, General's option to stay in business independently was destroyed by Bacardi's withdrawal of its account. Thus, through its repudiation, Bacardi destroyed General's negotiating leverage since General no longer had the alternative of continuing as an independent concern. Presumably, after Bacardi's withdrawal General's only alternative to selling to National was to liquidate. Thus, Bacardi's repudiation turned General's discussions with National from negotiations to buy a going concern into a liquidation sale. Instead of bargaining from strength, knowing it could reject a junk-value offer and carry on its business, General was left with one choice: sell at any price.

Under these facts, General had a reliance interest in Bacardi's promise. General was in lively negotiations with National, and it repeatedly informed Bacardi of this fact. A price was agreed upon, and based on that figure, Stout had to decide whether to close his doors or continue operating. General had a business opportunity that all parties knew would be devalued once Bacardi announced its intention to go elsewhere. The extent of that devaluation represents a reliance injury, rather than an injury to General's expectation of future

profit. The injury is analogous to the cost of moving expenses incurred as a result of promised employment in *Eby* and *Pepsi–Cola*.

Nor were these promises merely meaningless restatements of an understood at-will relationship. With its current business opportunity, General stood at a crossroads. Circumstances foreshadowed a costly demise for the company, but it was able to negotiate an alternative. Far from confirming the obvious, Bacardi wrote its assurances on a clean slate with full knowledge that General was just as likely to reject the offered relationship as embrace it. That this was the situation is indicated most clearly by Bacardi's repeated calls to check on Stout's impending decision. Bacardi reassured Stout of its commitment in full knowledge that he planned to reject National's offer and with the reasonable expectation that an immediate pull out would severely undermine General's asking price. Like the plaintiffs in *Eby* who moved based on the promise of a job, General incurred a cost in rejecting the deal that was non-recoverable once Bacardi's later decision became known.

There may always exist the potential for a quandry in a promissory estoppel action based on a promise of at-will employment. When could Bacardi terminate the relationship with General without fear of liability for reliance costs, once it made the assurances in question? Obviously we do not hold that General and Bacardi had formed a new, permanent employment relationship. How long an employee can rely on the employer's promise is not a matter we can decide here. The issue is one of reasonable reliance, and to the extent that there might be questions, they should be for trial.

### III.

We have, of course, reviewed this case in the posture of summary judgment. General's allegations still must be proven at trial. However, under Indiana law, we think that Bacardi's promise was of a sort on which General might rely, with the possibility of

damages for breach. For that reason the judgment of the district court is

REVERSED AND REMANDED.