D & G STOUT, INC., f/k/a General Liquors, Inc., David R. Stout, and Georgia R. Stout, Plaintiffs,

v.

BACARDI IMPORTS, INC., Defendant.

No. S87–605(RLM).

United States District Court, N.D. of Indiana, South Bend Division.

Oct. 21, 1992.

Franklin A. Morse II, South Bend, Ind., for plaintiffs.

Timothy W. Woods, South Bend, Ind., for defendant.

## MEMORANDUM AND ORDER

MILLER, District Judge.

This cause, which requires the court to consider the reach of promissory estoppel under Indiana law, came before the court for trial without intervention of a jury on remand following the Seventh Circuit's reversal of this court's earlier grant of summary judgment to the defendant. *D & G Stout, Inc. v. Bacardi Imports, Inc.*, 923 F.2d 566 (7th Cir.1991).

For the reasons that follow, the court concludes that although the defendant's promise was conditioned on future events and limited in duration by its context, and although the defendant was unaware of the nature of the plaintiffs' reliance on the promise, the plaintiffs have shown that the promise was made with the expectation that the plaintiffs would rely on it, that the promise induced reasonable reliance of a definite and substantial nature, and that injustice can be avoided only by the prom-

ise's enforcement through an award of damages, although in a lesser sum than sought by the plaintiffs.

This memorandum and order is intended to comply with the court's obligations under Fed.R.Civ.P. 52(a).

### I.

As 1987 began, Indiana was caught up in the series of acquisitions and mergers that had swept the nation's liquor distillers and wholesale distributors in the mid-1980's. In 1979, there had been more than a score of major wholesale distributors in Indiana; that number had dwindled to eight by 1985. General Liquors, Inc. (now known as D & G Stout, Inc., one of the plaintiffs in this action), was among the surviving distributors at the beginning of 1987. The South Bend-based distributor had controlled about forty-three percent of liquor distribution in northern Indiana in 1985, and had obtained Fort Wayne Liquors, Inc. in 1986, but the consolidation trend affected General Liquors, Inc. less favorably in the first half of 1987.

### A.

When 1987 began, General Liquors, Inc. ("General") was the northern Indiana distributor for four major supplier distilleries: James H. Beam Company, Brown–Foreman, Hiram Walker, and the defendant in this action, Bacardi Imports, Inc. In the spring of 1987, General learned that it no longer would be representing the Brown–Foreman line, which had been responsible for about eleven percent of General's liquor business. In June, the Jim Beam lines were withdrawn. Both withdrawals were done on thirty days' notice to General, the notice period customary in the industry; General had represented both suppliers on an at-will basis. Neither termination was due to General's performance.

General had entered the spring of 1987 with an eye toward expansion. In June, General's president, David Stout, had begun negotiations concerning a merger with the Fred A. Beck Company ("Beck") of Indianapolis. When Mr. Stout examined

the Beck's books, he concluded that company was saddled with too much debt to justify a merger. Mr. Stout also learned that Bacardi, which also supplied Beck, was not entirely pleased with its relationship with Beck's chief financial officer, who would have remained in place in the contemplated merger. Accordingly, Mr. Stout terminated the negotiations with Beck in June.

Mr. Stout also engaged in discussions with other distributors in or shortly before June. Olinger, a major distributor based in Indianapolis, discussed the purchase of General; General discussed the purchase of Monarch, another distributor in the southern part of the state. Neither discussion progressed very far; Olinger purchased another South Bend-based distributor.

### B.

June brought two other significant developments. First, as noted above, the Beam Company terminated General as a distributor; the Beam lines had accounted for thirteen percent of General's liquor business. Combined, the Brown–Foreman and Beam decisions reduced General from a $32.5 million business to a $19 million business. These line losses engendered grave concern both within and without General concerning General's future. Mr. Stout met frequently with other General officers and its accountant to discuss that future. Several possible courses of action were discussed, including seeking additional product lines, expanding territories, "downsizing", and closing altogether.

Mr. Stout did not want to close the business. His family had been in the wholesale liquor distribution business since Prohibition; he had been involved with General all his working life. General still had two major suppliers (Hiram Walker and Bacardi) and a third of some significance (Canandaguia). After reviewing several possible scenarios with General's accountant, Mr. Stout concluded that if General could keep those three product lines and downsize by closing the Fort Wayne facility, General could continue as a profitable busi-

ness. General listed the Fort Wayne building for sale, with an asking price of $960,-000.00.

### 1.

Uncertainties still remained; General's at-will distributorship agreements with Hiram Walker, Bacardi, and Canandaguia were terminable at any time. General's relationships with those suppliers had been good, but so, too, had been its relationship with the Beam Company. Although General had been a Bacardi distributor for as long as Mr. Stout could remember, market forces, including reduced consumer demand, were forcing unpleasant business decisions notwithstanding good relationships of long standing. Mr. Stout decided to seek verbal commitments from his three major suppliers. He obtained such commitments from Hiram Walker and Canandaguia.

### 2.

Also in June, Beck, unsuccessful in its pursuit of a merger with General, announced that it was closing its doors. Beck's closure would leave Bacardi with no distributor in southern Indiana. Accordingly, upon learning of Beck's decision, Bacardi arranged to send four people—vice president of marketing William Tovell, division manager Ron Tebbe, Atlantic regional manager Ned Russo, and Indiana sales manager Scott Narup—to Indianapolis to interview prospective replacements for Beck in southern Indiana. Those interviews were conducted on July 9.

Bacardi also invited General to the July 9 meeting. Although Mr. Stout had spoken of expansion to develop a state-wide distributorship, it does not appear that Bacardi gave even slight consideration to offering the southern distributorship to General, its northern distributor. To the contrary, Bacardi had serious concerns about General's viability as the northern distributor in light of the product line losses General had suffered. Bacardi's invitation to General to attend the July 9 session had two purposes: Bacardi wanted to get General's views on who should replace Beck in southern Indiana; more importantly, Bacardi wanted to acquire more information con-

cerning General's viability as a Bacardi distributor.

General, too, had a secondary motive in attending the July 9 interviews: Mr. Stout wanted to obtain Bacardi's assurance that the supplier-distributor relationship would continue with General. As noted before, Mr. Stout did not believe General could survive if it lost any of its three remaining principal lines. At this point, following the losses of the Brown–Foreman and Beam lines, Bacardi accounted for thirty percent of General's sales and twenty-three percent of General's profit.

### 3.

General's eggs were not wholly within a single basket when Mr. Stout and other General officers entered the hotel suite in Indianapolis to meet with Bacardi on the afternoon of July 9, however. Earlier that morning, Mr. Stout had a private meeting with James LaCrosse, who headed the Indianapolis-based National Wine & Spirits Corporation.

Mr. LaCrosse had come to the hotel for National's interview with Bacardi. The interview did not go well: National reported that it already distributed the product of Bacardi's principal competitor (Seagram), and that it would be interested in distributing Bacardi products only if granted a state-wide distributorship; the Bacardi representatives perceived the presentation as arrogant. Mr. LaCrosse also had a second motive in coming to the hotel, however. Like Bacardi, he questioned General's future in light of the loss of the Brown–Foreman and Beam lines. He wanted to buy General and thought Mr. Stout might be interested in selling.

Accordingly, pursuant to arrangements made a day or two earlier, Mr. LaCrosse met alone with Mr. Stout at the hotel for about an hour and discussed his desire to purchase General. Mr. LaCrosse made no concrete proposals, but was not misunderstood; Mr. Stout understood that Mr. LaCrosse very much wanted to acquire General. Mr. Stout did not disclose the topic of the LaCrosse discussion to either of the other two General officers who accompanied him to the interview.

### 4.

The varied motives of the Bacardi representatives and Mr. Stout led to three serious topics of discussion. First, the General officials were allowed to review the other interviewees' brochures and were asked their opinion as to what Bacardi should do about the southern Indiana distributorship. The Olinger presentation impressed the General officials, who recommended that Bacardi assign the southern Indiana distributorship to Olinger.

Discussion next turned to General's condition and future. Most of the discussion occurred between Bacardi's Mr. Tovell and General's Mr. Stout. They reviewed, in somewhat summary fashion, the remaining product lines General was distributing. Mr. Stout assured Bacardi that General would stay in business if it kept the Bacardi, Hiram Walker, and Canandaguia lines, and told Mr. Tovell he had commitments from Hiram Walker and Canandaguia. Mr. Tovell asked the name of the person from Hiram Walker who had given the assurance; Mr. Stout identified the person, and suggested that Mr. Tovell call that person for confirmation. Mr. Tovell went to another room in the suite and placed a call; the report was confirmed.

Mr. Stout did not disclose the morning's discussion with Mr. LaCrosse.

Mr. Stout then was able to raise the topic that caused him to be anxious at the July 9 meeting: the need for a commitment from Bacardi. He explained that Bacardi's continued business was necessary to General's continued operation. Mr. Tovell told Mr. Stout not to worry. He said that if General continued to meet Bacardi's expectations in sales, and if there were no changes in the market conditions, General would remain a Bacardi distributor.

Relieved at believing he had heard what he had hoped to hear, Mr. Stout raised still another issue. Recent consolidations in other states had left Bacardi with accounts receivable from distributors that no longer existed; accordingly, Bacardi had instituted a requirement that whenever a distributor lost a supplier constituting ten percent of

its product lines, the distributor was required to post a letter of credit with Bacardi. A distributor that lost enough other suppliers faced extinction, and Bacardi relied on its distributors' continued financial health and existence. The losses of the Brown–Foreman and Beam lines had made the requirement applicable to General, which had incurred considerable expense in compliance. Mr. Stout asked Mr. Tovell to relieve General of the requirement, but Mr. Tovell declined.

### C.

The conferees' post-meeting conduct was somewhat at odds with the rosy future depicted in the meeting. After Mr. Stout and the other General officials left the suite, the Bacardi people remained doubtful of General's continued vitality. Mr. Tovell did not believe General would survive the changes in the industry, and directed the other Bacardi personnel present at the interview to keep a finger on the pulse of the Indiana market and General's situation. For his part, Mr. Stout began negotiations in earnest for the sale of General to National.

### 1.

Mr. Stout met again with Mr. LaCrosse for more serious discussions on Saturday, July 11. By Monday or Tuesday, General had received a written offer from National. Drafts were exchanged between attorneys; Mr. Stout met with his accountant and General officials on a daily basis to discuss the National offer.

The National offer was attractive. National and General both realized that National could purchase only General's assets and not its supplier lines. The purchase would not include the right to distribute Bacardi products, for example. Thus, the offer was couched in terms of a purchase of assets. General's bargaining position was enhanced, however, by Mr. Stout's inclination, and General's ability, to remain in business. As the suitor, National had to make an attractive offer to have a realistic hope of acquisition.

For example, Mr. Stout insisted on including the Fort Wayne warehouse in the sale; if he was to be out of the business, he wanted to be fully out of the business. National had no need for the Fort Wayne warehouse, but included the building in its offer. Similarly, General owned several other assets, such as a BMW automobile, that National did not want to buy, but included in the offer nonetheless, lest General lose interest.

Even these efforts ultimately did not persuade Mr. Stout. Optimistic about the future, disinclined to end the business that had fed his family since prohibition, and concerned for the well-being of General's employees, Mr. Stout decided not to sell General. That decision evolved over the course of several days, and its timing is difficult to establish. The decision clearly had been made by July 21 or 22. During the week of July 20, General had begun to get inquiries from others—sales representatives, customers, suppliers—who had heard that a deal was in the air. General sales representatives, already jumpy due to the chaotic market conditions occasioned by acquisitions and consolidations, were looking into more secure employment situations. In successive meetings of General's management on July 22, and General's sales force on July 23, Mr. Stout announced the decision that General would stay in business rather than sell. General's attorneys were told of the decision on July 23; Mr. LaCrosse was notified shortly thereafter.

The decision might have been reached earlier. General's accountant was a key participant in the discussions about the National offer, but his records and recollection indicate that his last participation was around July 16. He believed the deal "had pretty much died or was dying out" by July 16, and his records reveal no further involvement with General between the 16th and July 31. The court believes, however, that Mr. Stout continued to wrestle with the issue for several days after July 16; that he conducted a meeting with General management on July 20 with a tentative view toward rejecting the National offer; and that he reached a final decision some time on July 21.

### 2.

Things were happening at Bacardi, as well. A second round of interviews were arranged to be held in Indianapolis on July 22 to allow Bacardi's chief executive officer, Edwardo Sardina, to meet the prospective distributors. Meanwhile, Mr. Narup and Mr. Russo tried to maintain current information on the market conditions and developments with General. On July 15, following a telephone conversation with a representative of Olinger, Mr. Narup reported to his superiors that General had lost two sales supervisors and five sales representatives. The record contains no evidence that Mr. Narup or any other Bacardi employee attempted to confirm this report with General. The information was incorrect; General had lost no more than one South Bend sales representative by that time, and would lose one more before July 30 (although about fifty people were let go when the Fort Wayne facility was closed). General's sales force consisted of forty-five people.

Bacardi also learned, correctly, that General had gained an additional product line. The McCormick line was a profitable line that sold about 130,000 cases annually on a statewide basis. General also had sustained something resembling a product line loss: the Schieffelin & Somerset line was "dualled", meaning that while General had been its sole distributor in northern Indiana, the supplier appointed a second distributor for the region.

Between July 9 and July 22, frequent telephone calls passed between General's Mr. Stout and Bacardi's Mr. Russo. During those calls, Mr. Russo repeatedly reaffirmed Mr. Tovell's statements of July 9— that unless there was some change in the conditions of General or the market, General would remain as Bacardi's northern Indiana distributor.

The parties—more accurately Mr. Stout and Mr. Russo—dispute whether Mr. Stout told Mr. Russo of the National negotiations in those phone calls. Mr. Stout remembers Mr. Russo telling him in those calls that General could not sell the Bacardi line, but Bacardi was behind him 100 percent, and Mr. Stout should "go for it", meaning General should stay in business. He recalls similar comments being made in an early morning July 23 call to Mr. Russo.[1] For his part, Mr. Russo recalls no mention of the National negotiations before the negotiations had been broken off. The court found both Mr. Stout and Mr. Russo to be credible witnesses, with Mr. Stout generally the more credible. Both witnesses, however, testified as to their recollections of conversations that occurred five years ago.

Other evidence leads the court to find that, while Mr. Stout assumed Mr. Russo was aware of the National negotiations, Mr. Stout did not tell him about those negotiations in terms Mr. Russo understood. To begin with, at a deposition taken much closer to 1987, Mr. Stout testified that his first recollection of mentioning the National negotiations to Mr. Russo was in the July 23 call, when he told Mr. Russo he had turned down the offer. Indeed, he conceded on cross-examination at trial that he was not positive as to whether there had been earlier discussions of the topic with Mr. Russo.

More importantly, the Bacardi records introduced into evidence at trial disclose no knowledge of the National negotiations. Many memoranda tracked the Bacardi chain of command, including one reporting the misinformation Mr. Narup had received from the Olinger representative. Given Mr. Stout's assurances on July 9 of General's intent to stay in business if Bacardi did not withdraw its line, it is difficult to believe that if Mr. Stout had mentioned to Mr. Russo that General might sell out to a distributor for Bacardi's principal competitor, no memorandum would report that.

General introduced evidence that news travels fast in the liquor industry, particularly news of acquisition discussions in 1987, and at least some distributor representatives were aware of the National—

---

**1.** The plaintiffs make much of the July 23 phone conversation, but the court believes Mr. Stout had made the decision not to sell a day or two earlier. Accordingly, no reliance can be found as to representations made in the July 23 phone call.

General negotiations at some point in June 1987. Mr. Stout may well have assumed that Mr. Russo knew what was going on by virtue of that grapevine. Mr. Stout may have alluded to the negotiations with that assumption in mind, but Mr. Russo knew only of the earlier Beck negotiations. The court finds that although Mr. Russo and Mr. Narup were directed to keep their fingers on the pulse of the Indiana and General situations, they missed the news of the General–National negotiations.

### 3.

On July 22, Mr. Sardina, Mr. Tovell, and others met with three potential distributors, chief among whom was Olinger. The Bacardi people perceived that Olinger's interest had transformed into an interest only for a statewide distributorship, although no one from Olinger actually said that. When the interviews concluded, Mr. Tovell held the belief that Olinger was the strongest choice, and that Olinger would accept the distributorship only on a statewide basis. The Bacardi interviewers did not, however, discuss the decision immediately after the interviews; Mr. Sardina indicated he wanted to think the matter through before seeking input from others.

On July 23, Mr. Russo drove Mr. Sardina and Mr. Tovell to the airport for their return to Florida. He did not discuss the Olinger topic with his passengers; nor did he discuss his telephone call with Mr. Stout earlier that morning, in which Mr. Stout reported that General had broken off negotiations with National.

Mr. Sardina and Mr. Tovell discussed the issue on their flight. Mr. Sardina expressed the belief that Bacardi's best long-term decision would be to appoint Olinger as its statewide distributor. Mr. Tovell agreed, noting his doubts about General's future, the "dualling" of the Schieffelin & Somerset line, and the (inflated) reports of sales personnel losses by General. Mr. Tovell believed that a single, strong statewide distributor was better for Bacardi than a regional distributor of dubious continuing viability. Mr. Sardina and Mr. Tovell had no authority to make the decision themselves. Upon their return to Florida, they contacted each of the other members of Bacardi's operations and achieved concurrence with their views. The decision to appoint Bacardi on a statewide basis, effectively withdrawing the Bacardi line from General, had been made.

Bacardi selected an unusual method of making the announcement. Olinger was summoned to a dinner at Bacardi's headquarters on July 29; the decision was announced at that dinner. Mr. Tovell did not disclose the decision to Mr. Narup, Mr. Russo, or Mr. Tebbe before the dinner. After making the announcement at the dinner, Mr. Tovell told Mr. Narup and Mr. Russo to go to South Bend and tell Mr. Stout the news.

Mr. Narup and Mr. Russo arrived at the General offices late in the afternoon of July 30 and gave Mr. Stout the news. They told him the product line was not being withdrawn on the basis of General's performance, but rather upon the overall situation in the state. They asked that General remain Bacardi's distributor in the north until the end of the year (although the smaller Martini & Rossi line would go to Olinger in thirty days), to allow General to enjoy the busy Christmas season and to give General an opportunity to obtain other lines to replace Bacardi.

### D.

Mr. Stout realized that he could not stay in business until the end of the year after the Bacardi announcement; General sales people would leave in droves, seeking more secure employment. Accordingly, Mr. Stout immediately instructed his attorneys to re-open negotiations with National. This time around, though, the bargainers' roles were reversed: General was now the party ardent for a deal, while National could pick and choose. General did not believe that any other viable purchasers existed: Olinger, the other statewide power, recently had acquired another South Bend distributor and had no need for another; Monarch, with which General had earlier discussions, would have needed to make licensing changes before it could own a liquor distributor.

Accordingly, National held the upper hand in negotiations in August. The concessions National was willing to make in July were not needed in August. A deal ultimately was reached in August whereby National purchased General's assets, but the deal's terms differed considerably from those offered in the first round of negotiations:

Under the terms of the August purchase, $250,000.00 was deducted from the amount paid for the inventory; the July offer included no such deduction.

In the August purchase, National bought General's accounts receivables at a discount amounting to $5,000.00; no such discount was in the July offer.

In August, National declined to buy several items of office furniture and equipment that had been included in the July offer. As a result, only $296,000.00 of the eventual purchase price was attributable to office furniture and equipment, contrasted to $458,000.00 in the July offer.

National bought General's South Bend facility for $900,000.00, after having offered $936,000.00 in July.

National offered $700,000.00 for the Fort Wayne facility in July, despite not wanting it. In August, still not wanting it, National declined to purchase the Fort Wayne facility.

As a result, General received $1.956 million for its assets in August. Had General accepted the July offer, it would have received $3.109 million. General, of course, still retained the unsold office furniture and equipment, and was able to sell most of it; credible testimony presented at trial indicates that as a result of those sales, the difference in amounts received for that property was $103,050.00.

General still owned the Fort Wayne facility: neither National nor any buyer on the market seemed to want to buy it. In December 1987, General entered into a three-year "triple net" lease under which the lessors would pay the mortgage, real estate taxes, maintenance, and insurance. The lease effectively removed the building from the market for purchase by users, but might have attracted investors looking for an income stream. No offers were received while General owned the facility. In January 1989, on advice of their accountant, Mr. and Mrs. Stout bought the Fort Wayne facility, for $675,000.00, to protect the corporation's subchapter S status.

Several problems arose with the facility after the lease expired in May 1991, but because those problems arose after General, the entity to which Bacardi made any promise of a continuing distributorship, sold the building, the court does not believe those problems are pertinent to resolution of the issues before the court. Evidence concerning those problems was received conditionally subject to a motion to strike, and the court now grants the motion to strike the evidence relating to losses incurred with respect to the Fort Wayne property after the transfer to the Stouts.

## II.

The parties agree that Indiana law governs this diversity suit.[2] The basic principles of governing Indiana law may be drawn principally from two cases: *First National Bank of Logansport v. Logan Mfg. Co., Inc.*, 577 N.E.2d 949 (Ind.1991), in which the Indiana Supreme Court adopted the doctrine of promissory estoppel embraced in § 90 of *Restatement (Second) of Contracts*, and *D & G Stout, Inc. v. Bacardi Imports, Inc.*, 923 F.2d 566 (7th Cir. 1991), in which the Seventh Circuit Court of Appeals reversed this court's earlier grant of summary judgment to Bacardi.

### A.

■ It is important to note at the outset that the Seventh Circuit opinion, while helpful with respect to determination of applicable Indiana law, cannot resolve this case. The facts found to be true following trial differ in several material respects from the

**2.** Plaintiff D & G Stout, Inc. is incorporated in, and has its principal place of business in, Indiana. Plaintiffs David and Georgia Stout are Indiana citizens. Defendant Bacardi Imports, Inc. is incorporated in, and has its principal place of business in, Florida.

facts necessarily assumed to be true at the summary judgment stage:

(1) The court of appeals assumed that at the July 9 meeting with General, "Bacardi emphatically avowed that it had no intention of taking its line to another distributor in Northern Indiana." 923 F.2d at 567. Evidence at trial indicated that Mr. Tovell's promise was contingent upon future events.

(2) The court of appeals assumed that during the negotiations between General and National, "Bacardi kept in close contact with General to find out whether it would indeed sell," 923 F.2d at 567, that "General was in lively negotiations with National, and it repeatedly informed Bacardi of this fact," 923 F.2d at 569, and that "Bacardi reassured Stout of its commitment in full knowledge that he planned to reject National's offer and with the reasonable expectation that an immediate pull out would severely undermine General's asking price." 923 F.2d at 570. Evidence at trial persuades the court that while Mr. Russo kept in close contact with Mr. Stout during the negotiations and repeatedly reaffirmed what Mr. Tovell had said on July 9, neither Mr. Russo nor anyone else at Bacardi was aware of the negotiations.

(3) The court of appeals assumed that Mr. Stout, in the early morning July 23 phone conversation with Mr. Russo, had not yet made the final decision as to the National offer and "again sought assurances from Bacardi. The supplier unequivocally reconfirmed its commitment to stay with General, and Stout replied that, as a result, he was going to turn down National's offer and would continue operating." 923 F.2d at 567. Evidence at trial persuades the court that Mr. Stout had decided to reject the National offer before that phone call. He so informed General management on July 22, although he did not inform his employees and attorneys, or Mr. LaCrosse, until the following day, after the call to Mr. Russo.

The court of appeals acknowledged that it was stating "General's version of the facts", 923 F.2d at 567, and it acted properly in doing so. At the summary judgment stage, a court must construe the facts as favorably to the non-moving party as the record will permit, *Brennan v. Daley*, 929 F.2d 346, 348 (7th Cir.1991), and draw any permissible inferences from the materials before it in favor of the non-moving party, *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Prince v. Zazove*, 959 F.2d 1395, 1398 (7th Cir.1992), as long as the inferences are reasonable. *Bank Leumi Le–Israel, B.M. v. Lee*, 928 F.2d 232, 236 (7th Cir.1991). The facts following trial, however, differ from the facts assumed for summary judgment purposes. Accordingly, while the Seventh Circuit's earlier opinion in this case remains controlling insofar as it interprets Indiana law, it remains for this court to apply that law to the facts found following trial.

### B.

In *First National Bank of Logansport*, the Indiana Supreme Court set forth five elements for a claim of promissory estoppel: (1) a promise by Bacardi (2) made with the expectation that General will rely thereon (3) which induces reasonable reliance by General (4) of a definite and substantial nature and (5) injustice can be avoided only by enforcement of the promise. 577 N.E.2d at 954.

Based on the record at the summary judgment stage, the Seventh Circuit concluded that Bacardi made a promise, that the promise was made with actual knowledge that termination would undermine General's bargaining position with National, and that General relied on Bacardi's promise to remain with General. The only issue specifically left open was whether General's reliance was reasonable. Nevertheless, the different factual record currently before the court, requires the court to reexamine whether each of the five elements have been established based on the facts presented at trial.

■ *1. The Existence of a Promise.* First, there was a promise. Bacardi promised that General would continue as its

distributor in northern Indiana, albeit subject to the conditions that General would continue to meet Bacardi's expectation in sales and no market changes would occur. This promise suffices to provide a basis for an action under § 90. The conditional or indefinite nature of the promise standing alone does not preclude an action under a promissory estoppel theory. *See First National Bank v. Logan Mfg. Co.*, 577 N.E.2d 949 (court not precluded from finding a promise when indefinite terms prevented recovery for breach of oral contract and unfulfilled conditions prevented recovery under written contract); *Janke Construction Co. v. Vulcan Materials Co.*, 527 F.2d 772 (7th Cir.1976) (promise actionable under § 90 need not have all the elements of an offer that would result in a binding contract). As will be discussed below, however, the promise's conditional nature is relevant as to whether the remaining elements have been established. *See Local 1330, United Steel Workers v. United States Steel Corp.*, 631 F.2d 1264 (6th Cir. 1980) (manufacturer not liable on promise to continue plant in operation because promise conditional on profitability).

 *2. Made with Expectation of the Promisee's Reliance.* Bacardi must have made the promise with the expectation that General would rely on it. Under § 90 and Indiana cases applying § 90, the second element is established if Bacardi either had actual knowledge of General's reliance or reasonably should have expected General to rely on the promise. The standard for testing a promisor's expectation is an objective one, under which the promisor is bound if the promisor should have had reason to expect reliance, even if the promisor did not in fact expect it. *See Restatement* § 90, comment b. An actual expectation of reliance is unnecessary for a promise to be binding under an estoppel theory. No Indiana court has addressed explicitly whether the second element embodies an objective or subjective standard, but Indiana courts have assumed that an objective standard applies and have enforced promises when the promisor either had actual knowledge of reliance or should have known of the promisee's reliance. *First National Bank v. Logan Mfg. Co.*, 577 N.E.2d at 955 (bank reasonably should have expected that Garrett and Moore would rely on the bank's representations, and trial court found that bank had actual knowledge of such reliance); *Hoo Siong Chow v. Transworld Airlines*, 544 N.E.2d 548, 550 (Ind.App.1989) (TWA made promises that it reasonably should have expected to induce Chow to refrain from calling Singapore Airlines).[3] Because foreseeable

**3.** Some of the parties' disagreement as to the appropriate standard may be attributable to a difference in form between the Indiana Supreme Court's statement of the estoppel elements and the *Restatement*'s characterization of the elements. *Restatement* § 90 by its terms requires a "promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee, and which does induce such action or forbearance." As such, the *Restatement* suggests that the promisor's expectation should be judged under an objective standard, *i.e.*, whether the promisor reasonably should have expected reliance, while the promisee's reliance is judged under a subjective standard, *i.e.*, whether the promisee actually relied.

Indiana purports to follow the *Restatement*, but the elements of promissory estoppel as consistently summarized by Indiana courts differ from the plain language of § 90. Indiana courts have summarized the essential elements as (1) a promise, (2) made with the expectation that the promisee will rely thereon (3) which induces reasonable reliance. *See First National Bank v. Logan Mfg. Co*, 577 N.E.2d 949, 951.

This characterization implies that the promisor's expectation is judged by a subjective standard, *i.e.*, whether the promise was made with an (actual) expectation of reliance, but the promisor's reliance is judged by an objective standard, *i.e.*, reliance must be reasonable.

Regardless of this semantic difference, Indiana courts appear to have looked to the reasonableness of both the promisor's expectation and the promisee's reliance. For instance, in *First National Bank*, the court concluded that the bank reasonably should have expected that Garrett and Moore would rely on the bank's representation, and that Garrett and Moore acted in reasonable reliance. Scholars dispute whether it is more appropriate to look to the reasonableness of the promisor's expectation or the reasonableness of the promisee's reliance. *See* Benjamin F. Boyer, "Promissory Estoppel: Requirements and Limitations of the Doctrine," 98 U.Pa.L.Rev. 459, 461–62 (1950) ("Solution ... is in testing the promise by an objective standard to determine whether or not the promisor should have foreseen action by the promisee"); *cf.* Melvin A. Eisenberg, "Donative Promises", 47

reliance, as well as reliance actually foreseen, may serve to bind a promisor, Bacardi need not have known of General's negotiations with National in order to have made a binding promise.

■ The parties disagree as to whether, under the second element, the plaintiffs must show that National should have known of the specific form that General's reliance took, or whether the plaintiffs need show only an expectation of general reliance on the promise. Bacardi contends that General must show that Bacardi should have known that General would turn down a purchase offer.

Determining whether Bacardi reasonably should have expected General to rely on its promise first requires determination as to what constituted General's reliance in this case. Bacardi suggests that to be bound to its promise, it had to have reason to know that General would forego an opportunity to sell its business; General contends that it need not prove that Bacardi knew or should have known the specific form General's reliance would take.

Under § 90 and Indiana's application of the principles of § 90, it is not the foregone opportunity itself that the promisor must reasonably have expected; it is the reliance that causes the promisee to forego an opportunity that must be expected. Bacardi need not have foreseen the particular opportunity foregone; it need only to have foreseen that its promise would induce General to stay in business, thereby foregoing an opportunity.

■ The plain language of § 90 provides some support for Bacardi's position to the extent that it speaks of "*such* action or forbearance". Commentators have interpreted this language to provide that the promisor is not liable if the promisor had no reason to expect reliance of the sort that occurred. *See* 1 E. Allan Farnsworth, *Farnsworth on Contracts* § 2.19 (1990). However, this principle does not require a promisee to prove that a promisor should have known of the precise form that the promisee's reliance would take; it merely requires that the general nature or extent of the promisee's reliance be reasonably expected.[4]

■ Even if a promise is not conditional on certain actions taken by the promisee, it may be reasonable for the promisor to expect reliance. Hence, in *Hoo Siong Chow v. Transworld Airlines*, 544 N.E.2d at 549, the court found that TWA was bound on its promise that it would book its passenger on the next available flight to Singapore when the plaintiff's connecting flight through San Francisco was delayed. TWA's promise did not contemplate a specific action by the promisee, but the court nevertheless found that TWA was bound by its promise because TWA reasonably should have ex-

U.Chi.L.Rev. 1, 20–21 (1979) ("[T]he focus on whether the promisor should reasonably expect to induce the promisee's reliance seems unnecessary and probably undesirable."). Because Indiana looks to both, the court does not take sides in this debate.

4. The appropriate scope of inquiry as to whether it is reasonable for promisor to expect reliance on a promise is demonstrated by way of a hypothetical based on the seminal case of *Ricketts v. Scothorn*, 57 Neb. 51, 77 N.W. 365 (1898). *See* 1 E. Allan Farnsworth, *Farnsworth on Contracts* § 2.19 (1990) [hereinafter *Farnsworth*]. In *Ricketts,* the court found that a grandfather was bound by his promise to pay his granddaughter $2,000.00 when she subsequently quit her job in reliance on that promise. In *Ricketts,* the grandfather expressed his hope that his granddaughter would no longer have to work. *Farnsworth* notes that it would have been more difficult (but presumably not impossible) to show a reasonable expectation of reliance if the grandfather had not expressed his hope that it would enable his granddaughter to stop working. *Farnsworth,* at 142. Furthermore, if, after the grandfather had expressed that hope, his granddaughter had relied on the promise of money by buying a gold watch or by adopting a more lavish standard of living, it would have been difficult to show that the grandfather should have reasonably expected this sort of reliance.

Applied to the facts of this case, it is reasonable to assume that General would rely on Bacardi's promise by remaining in business as a distributor; however, it would not have been reasonable for General to purchase additional assets in anticipation of an increase in business. Corbin has analogized the factual inquiry as to the promisor's reasonable expectation to standards under traditional tort or contract law, presumably the standard of reasonable foreseeability. *See* 1A *Corbin on Contracts* § 200, p. 218.

pected that its promise would induce the passenger to refrain from calling Singapore Airlines or, conceivably, could have induced him not to attempt to hold up the flight to Singapore. 544 N.E.2d at 549. The specific act that the passenger refrained from in reliance on TWA's promise was not directly material; the important factor was that TWA reasonably should have expected the passenger to refrain from acting in reliance on the promise. The court noted that "the inquiry here is simply whether Chow refrained from contacting Singapore Airlines himself in reliance on TWA's promise to secure a seat for him on the next Singapore Flight." 544 N.E.2d at 550. The plaintiff did not have to prove that his damages were caused by TWA's failure to perform as it had promised; he had to prove only that TWA's promise caused him to rely on the promise, thereby causing him to forego other options. *Id.*

■ Similarly, the appropriate inquiry in this case is whether General refrained from exercising other options or making alternative arrangements in reliance on Bacardi's assurance that General would remain a Bacardi distributor. It is the reliance itself and the extent of the reliance, not the result of that reliance, that the promisor reasonably must expect.

■ Promissory estoppel applies when a promise induces forebearance on the promisee's part that is reasonably expected by the promisor. *See Restatement* § 90; *First National Bank v. Logan Mfg.*, 577 N.E.2d at 954. Bacardi's promise induced forbearance on General's part. General gave up an opportunity to sell its assets to National in favor of the status quo. If the claimed reliance consists of forbearance rather than affirmative action, proof that the promise induced this forbearance requires a showing that the promisee could have acted, *see Pitts v. McGraw–Edison Co.*, 329 F.2d 412 (6th Cir.1964), but the court can find no legal or equitable basis for requiring that the promisor should have had knowledge as to what opportunity was actually foregone by the promisee, as long as the promisor reasonably should have

expected the promisee to refrain from acting in reliance on the promise.

■ Bacardi reasonably should have expected General to remain in business as a distributor in reliance on Bacardi's commitment, thereby foregoing any opportunities that would have required General to leave the distribution business. Indeed, Bacardi's promise required such reliance on General's part. Bacardi could only remain with General as long as General remained in business. If Bacardi did not expect or did not desire General to remain in business, it would not have made the promise.

Bacardi knew when it made the promise that General's survival as a liquor distributor depended on Bacardi's business. It was concerned about General's viability and believed that General would have difficulty remaining in business even with Bacardi on board. Bacardi may have been more pessimistic about General's future than was General itself, but Mr. Stout told Mr. Tovell that General needed Bacardi's commitment, plainly implying that without the commitment, General would have to consider going out of business. Bacardi gave its commitment, and did so at a time less successful distributors were going out of business by being acquired by more successful distributors. Bacardi knew its commitment was sought with an eye toward future viability, and gave that commitment. Mr. Russo underscored that commitment in the ensuing fortnight by urging General to "go for it".

Based on Bacardi's representation that General's distributorship was not immediately threatened, General chose not to pursue its other options. Thus, Bacardi reasonably should have expected General to remain in business as a liquor distributor based on Bacardi's representations. That Bacardi did not know specifically what options were available does not preclude recovery under the principles of promissory estoppel.

*3. Inducing Reasonable Reliance by the Promisee.* General relied on Bacardi's promise. Had Bacardi not made assurances to General on July 9, General would have gotten out of the business. Mr. Stout

sought Bacardi's assurances because he knew that retention of Bacardi was essential to his company's continued viability. Mr. Stout seriously considered National's offer, but ultimately declined the offer based on Bacardi's commitment. Whether General's reliance was reasonable is a more difficult question, presenting two related factual issues.

■ The first issue is a result of the evidence revealed at trial: whether it was reasonable for General to rely on Bacardi's promise in light of its conditional nature and the conditions of the liquor distribution market at the time the promise was made. The second issue is that specifically posed by the Seventh Circuit: how long could General reasonably rely on Bacardi's promise in light of their at-will contractual relationship?

Bacardi contends that it was unreasonable for General to rely on Bacardi's promise in light of the changing nature of the liquor distribution market in Indiana in 1987. Bacardi contends that the at-will nature of its relationship with General, the recent exodus of two other major suppliers from General's ranks, as well as General's own doubts as to Bacardi's commitment, made it unreasonable for General to rely on Bacardi's promise. In light of these uncertainties, Bacardi argues that had General wanted a definite commitment it should have asked for a binding contract. None of these factors made it unreasonable for General to rely on Bacardi's promise.

Bacardi essentially argues that based on the conditions of the market, General should have known that Bacardi's assurances rang hollow. The court does not interpret the doctrine of promissory estoppel to require skepticism about a promise's legitimacy. Nothing on the face of Mr. Tovell's statement suggested that Bacardi's current commitment to General was less than firm.

Unlike Bacardi, Beam and Brown Foreman did not provide any assurances to General regarding continued business before leaving General. Based on General's prior losses, Mr. Stout was genuinely concerned about Bacardi's intentions, and so sought information from Bacardi as to its future intentions. Before the July 9 meeting, Mr. Stout had no reason to assume that Bacardi would remain with General; as Bacardi points out, such an assumption would have been unreasonable in light of market conditions. However, once Mr. Tovell told him that General would remain Bacardi's distributor as long as General continued to meet Bacardi's sales expectation and no changes in market conditions occurred, Mr. Stout reasonably could assume that Bacardi would remain with General, at least for the time being.

It was reasonable for Mr. Stout to conclude that the rush to consolidation had lessened, at least temporarily. He had gotten a renewed commitment from Hiram Walker and Mr. Tovell had given him a similar commitment from Bacardi. Mr. Tovell's representation, although not unequivocal, expressed confidence that General would continue to meet Bacardi's needs, and expressed Bacardi's intention to remain with General as long as General filled its needs. Based on this representation, it was reasonable for General to remain in business at that time.

■ The conditional nature of Bacardi's commitment does not make General's reliance unreasonable. This case is distinguishable from the case of *Local 1330, United States Steel Workers v. U.S. Steel*, 631 F.2d 1264, 1279 (6th Cir.1980), cited by Bacardi. In that case, the court held that the steel workers' union could not show reasonable reliance on representations by plant management that a plant would remain open as long as it was profitable because the union unreasonably interpreted "profitability" as meaning coverage of the plant's fixed costs. The court found that the term "profitability" had to be read in the context of normal corporate accounting, and the plant had not been "profitable" under this definition.

Mr. Tovell said Bacardi would remain with General as long as market conditions did not change. Bacardi cites to rumors of personnel defections at General, the "dualling" of the Schieffelin & Somerset line, and Bacardi's perception that Olinger only had

interest in distributing Bacardi statewide, as evidence of changed market conditions justifying Bacardi's decision to end General's distributorship. The rumors of defections at General proved to be greatly exaggerated, and Bacardi made no effort to confirm them; in addition to losing exclusive rights to Schieffelin & Somerset, General gained the McCormick line. Moreover, the possibility that a distributor would only take Bacardi on a statewide basis was not a "change" from the conditions of July 9; Bacardi earlier had rejected a similar offer from National. Finally, the limited time between July 9 and July 23 cautions against a finding that market conditions changed. What changed was not actual market conditions, but rather Bacardi's assessment of future market trends and its plans to address those trends.

By July 9, 1987, the liquor distribution business had already undergone tremendous changes and was in a state of uncertainty. None of the events relied on by Bacardi changed the market in a way that would impact the ability of General to serve as Bacardi's distributor. Bacardi's representations made it reasonable for General to assume on July 9 that Bacardi had no immediate interest in going to a statewide distributorship, so General had no reason to assume that Olinger's subsequent interest in a statewide distributorship would amount to "changed market conditions" justifying General's termination. Mr. Russo's subsequent assurances to Mr. Stout that he should "go for it" and continue in business gave more reason for Mr. Stout to think that General's position with Bacardi was no longer in jeopardy.

In short, neither General's performance nor the market conditions changed between July 9 and July 23. Bacardi simply changed its mind, and General was not unreasonable in failing to anticipate that.

■ Bacardi's commitment was not, however, perpetual. The court declines to set an outer temporal limit for the reasonableness of General's reliance; regardless of how long General could have relied, it acted within the bounds of reasonableness in this case. Again the court looks to the context of the July 9 meeting.

Bacardi's search for a southern Indiana distributor gave both Bacardi and General cause to reassess their relationship. Mr. Stout could reasonably assume that Mr. Tovell's assurance—that Bacardi would be with General as long as things didn't change—made in the context of Bacardi's search for a southern Indiana distributor, meant at the very least, that General's distributorship was not under reconsideration by virtue of Bacardi's search for a new southern Indiana distributor. It was reasonable to assume that Bacardi had determined its short-term strategy and that General was part of that strategy, regardless of Bacardi's decision as to the southern distributor. General had no reason to think that Bacardi would announce a different decision three-and-a-half weeks later.

Bacardi points out that it did not actually terminate General's distributorship until December 31. On July 29, it only announced its decision to terminate General. Bacardi contends that it was reasonable to wait until December 31, 1987 to terminate General's distributorship, and cites to cases where courts found reasonable much shorter notices of termination of at-will distributorships. *See, e.g., B & T Distributors, Inc. v. Meister Brau, Inc.* 459 F.2d 29 (7th Cir.1972). Whether Bacardi provided reasonable notice to General is not directly material to the issue of whether General's reliance was reasonable.

■ Promissory estoppel is an exception to the general rule that estoppel is not available upon promises to be performed in the future. *First National Bank v. Logan Mfg. Co.,* 577 N.E.2d at 955; *Reeve v. Georgia–Pacific Corp.,* 510 N.E.2d 1378, 1382 (Ind.App.1987). Whether Bacardi's commitment constituted a misrepresentation as to current fact or an unfulfilled promise as to future action is irrelevant to the application of promissory estoppel. *Citizens State Bank v. Peoples Bank,* 475 N.E.2d 324, 327 (Ind.App.1985). On July 9, Bacardi made a promise as to its future actions, which Mr. Russo subsequently reaffirmed. In reasonable reliance

on that promise, General turned down National's offer. By July 29, when Bacardi changed the terms of its commitment, it was too late; General already had relied to its detriment on the prior commitment.

As framed by the Seventh Circuit, "the issue is one of reasonable reliance." *D & G Stout v. Bacardi*, 923 F.2d at 570. At issue is not specifically whether Bacardi's notice was reasonable under the terms of the at-will distributorship agreement; General is not suing for breach of the at-will contract, it is suing for the costs incurred in reliance on Bacardi's promise. By July 23, General had acted in reasonable reliance on Bacardi's promise that General would remain Bacardi's distributor as long as General continued to meet Bacardi's sales expectations and there were no changes in market conditions. Bacardi effectively revoked this commitment by its announcement that General's distributorship would be terminated effective December 31. Bacardi changed the terms of its promise from a distributorship of an indefinite duration, to a distributorship that would terminate as of December 31. The decision to terminate the distributorship was not a decision made in accordance with the terms of the promise: market conditions had not changed as of that date; rather, the decision was a change in the terms of the promise itself.

Bacardi might have terminated General prior to December 31 consistent with the terms of its July 9 commitment. A change in the market might have occurred between July and December that would have justified termination under the terms of the July 9 commitment. That possibility, however, does not preclude General's recovery in this case.

■ General need not prove that it would not have suffered reliance damage had Bacardi stayed with General until market conditions changed. Causation is not an element of promissory estoppel. In *Hoo Siong Chow v. Transworld Airlines*, 544 N.E.2d at 548, the trial court erred by imposing on the passenger the burden of proving that had TWA called Singapore Airlines within a reasonable time after

promising to do so, the passenger would have gotten an economy class seat to Singapore. Similarly, courts have held that where an employer repudiates an offer of at-will employment on which a prospective employee has relied, the fact that the employer could have fired the employee shortly thereafter without liability does not preclude recovery under a promissory estoppel theory. *Bower v. AT & T Technologies, Inc.*, 852 F.2d 361, 363 (8th Cir.1988).

That Bacardi might have terminated General due to a change in market conditions shortly after July 29, while perhaps diminishing the security or value of the distributorship, does not fully eradicate the binding quality of its promise. *Bower v. AT & T Technologies, Inc.*, 852 F.2d at 363. It is sufficient that General's reliance was reasonable when it relied on the promise. As explained above, General has met this burden.

■ *4. Reliance of a Definite and Substantial Nature.* To establish this element, General must show that Bacardi induced a substantial change in General's position. *First National Bank v. Logan Mfg. Co.*, 577 N.E.2d at 954. General was not induced to change its position; rather, it was induced to forego an opportunity and maintain the status quo. When reliance consists of the promisee's forbearance rather than affirmative action, proof that the promise induced the forbearance requires a showing that the promisee could have acted. *See Hoo Siong Chow v. Transworld Airlines*, 544 N.E.2d 548; *Pitts v. McGraw–Edison Co.*, 329 F.2d 412; *see generally* 1 *Farnsworth on Contracts* § 219, at 141.

■ General's reliance was substantial. National's offer was before General. Mr. LaCrosse had made a firm offer; Mr. Stout only had to accept that offer. Bacardi's promise induced him to reject the offer, thereby causing General to forego that definite opportunity.

■ *5. Injustice Can Be Avoided Only by the Promise's Enforcement.* The court believes justice requires enforcement of Bacardi's promise. The other elements

concern questions of fact to which the court applies the equitable considerations of the last element. *Eby v. York–Division, Borg–Warner,* 455 N.E.2d 623 (Ind.App. 1983). *Restatement* § 90, comment b, provides that whether justice requires enforcement of the promise depends:

> ... on the reasonableness of the promisee's reliance, on its definite and substantial character in relation to the remedy sought, on the formality with which the promise is made, on the extent to which the evidentiary, cautionary, deterrent and channeling functions of form are met by the commercial setting or otherwise, and on the extent to which such other policies as the enforcement of bargains and the prevention of unjust enrichment are relevant.

In addition to the equitable considerations implicit in the court's discussion of the other elements above, the court believes the commercial setting in which the Bacardi's promise was made merits consideration. As emphasized throughout the trial, the liquor distribution business traditionally had operated on an informal basis. Long term relationships were formed based on nothing more than a handshake. Bacardi and General had done business in this environment for years to the satisfaction of both, making it all the more reasonable for Bacardi to have expected General to rely on Bacardi's word, and for General to actually rely on it. By 1987, the market was in the midst of a wholesale change, not only in terms of the number of players and the names of those players, but in the way in which business was done. Nothing in the changes sweeping the liquor market, however, suggested that the old rules were out the window, particularly with respect to a relationship of such long standing.

### C.

Having found the doctrine of promissory estoppel applicable under the facts found at trial, the court must determine the damages to be awarded. *Restatement* § 90, to which Indiana looks for guidance on the question of damages, *First National Bank v. Logan Manufacturing Co.,* 577 N.E.2d

at 956, provides that "the remedy granted for breach may be limited as justice requires." Comment (d) to § 90 explains further:

> [T]he same factors which bear on whether any relief should be granted also bear on the character and extent of the remedy. In particular, relief may sometimes be limited to restitution or to damages or specific relief measured by the extent of the promisee's reliance rather than the terms of the promise.... Unless there is unjust enrichment of the promisor, damages should not put the promisee in a better position than performance of the promise would have put him.

As noted by the Seventh Circuit, justice in this case requires an award of reliance damages. *See D & G Stout, Inc. v. Bacardi Imports, Inc.,* 923 F.2d at 569. The parties however, disagree as to the extent of the plaintiffs' reliance and which plaintiffs may recover reliance damages.

### 1.

 The parties disagree as to whether Bacardi is liable for costs incurred by General, its successor D & G Stout, and Mr. and Mrs. Stout, in maintaining the Fort Wayne warehouse. The plaintiffs contend the expenses associated with the Fort Wayne warehouse are reliance damages because had General not relied on Bacardi's promise, it would have sold the property to National. The court finds that equitable principles underlying the promissory estoppel doctrine preclude recovery of expenses associated with the Fort Wayne property.

Awarding the plaintiffs' reliance damages associated with the Fort Wayne property would violate the principle stated in *Restatement* § 90, comment d, that unless there is unjust enrichment of the promisor, damages should not put the promisee in a better position than performance of the promise would have put it.

General put the Fort Wayne facility on the market before receiving Bacardi's commitment; regardless of whether Bacardi remained with General, General was going to sell the Fort Wayne warehouse. If Bacardi had not terminated General's distribu-

torship, General intended to close its Fort Wayne facility and still needed to find a buyer for the warehouse. Therefore, the expenses associated with the warehouse are not recoverable because General would have incurred those costs even if it had remained as Bacardi's distributor. Justice would not be served by making Bacardi pay for costs that the plaintiffs would have incurred even if Bacardi had kept its commitment. Since the warehouse damages are the only damages claimed by Mr. and Mrs. Stout, as distinct from their corporation, the Stouts cannot recover.

Moreover, it is doubtful whether expenses associated with the Fort Wayne property reasonably can be considered damages incurred in reliance on Bacardi's promise. Bacardi's commitment had no impact on General's intentions: the warehouse was on the market before July 9; the warehouse was on the market after July 9.

2.

■ The same cannot be said of General's other assets. The evidence at trial showed that absent Bacardi's commitment, General would have sold its other assets to National at the price offered by National in July. Therefore, the difference between National's initial offer and the final sale price may be recovered as damages incurred in reliance on Bacardi's promise.

As noted in the findings of facts, that difference consisted of $103,050.00 with respect to office furniture, merchandise, automobiles, and delivery equipment. The difference as to inventory was $250,000.00. The difference as to receivables was $5,000.00. The difference as to the South Bend real estate was $36,000.00. In sum, excluding the Fort Wayne real estate, the difference between the rejected July offer and the accepted August offer was $394,050.00.

3.

■ General also seeks an award of prejudgment interest. Prejudgment interest is proper under Indiana "when damages are ascertainable in accordance with fixed rules of evidence and accepted standards of valuation at the time the damages accrue,

but is not appropriate when the trier of fact must use its best judgment to assess the amount of damages." *Dale R. Horning Co. v. Falconer Glass Industries, Inc.*, 730 F.Supp. 962, 969 (S.D.Ind.1990). The "ascertainable standard" refers to the amount of damages, rather than liability for those damages. The trier of fact need always exercise its judgment to determine the liability for damages, but prejudgment interest is proper when the trier of fact need not exercise its judgment to assess the amount of the damages. *Indianapolis v. Twin Lakes Enterprises*, 568 N.E.2d 1073, 1086 (Ind.App.1991); *Weisman v. Hopf-Himsel, Inc.*, 535 N.E.2d 1222 (Ind. App.1989).

■ General's claim was liquidated insofar as General sought its reliance damages for losses on the sale of the inventory, receivables, and the South Bend real estate. As to those items, the court merely had to compare the July offer with the August offer, much like the simple mathematical computations held to support an award of prejudgment interest in *Weisman v. Hopf-Himsel, Inc.*, 535 N.E.2d at 1234.

■ Determining General's reliance damages with respect to the office furniture, merchandise, automobiles, and delivery equipment was not so ministerial, however. In valuing that category of the claim, it was necessary to determine not only the price at which the items ultimately were sold, but also whether the ultimate sale prices reflected a fair market value. The court did so by crediting the testimony of Mr. Massaglia, whom the court found to be a credible witness, but Mr. Massaglia testified that his computations included the exercise of some judgment, such as the exclusion of the book value of goods sold for $20,000.00 because Mr. Stout may not have been sufficiently aggressive in selling those goods. Because the court was required to use its judgment in calculating the reliance damages as to these items, prejudgment interest is inappropriate, *Indianapolis v. Twin Lakes Enterprises*, 568 N.E.2d at 1086, at least as to that portion of the claim.

■ Under Indiana law, the trial court is to assess prejudgment interest on that

portion of the damages that was ascertainable by mere mathematical computation. *Gibson–Lewis Corp. v. Northern Indiana Public Service Co.*, 524 N.E.2d 1316, 1319 (Ind.App.1988); *Brant Construction Co. v. Lumen Construction Co.*, 515 N.E.2d 868, 873 (Ind.App.1987). Accordingly, while General's proven reliance damages total $394,050.00, General is entitled to prejudgment interest on all but the $103,050.00 attributable to the office furniture, merchandise, automobiles, and delivery equipment, or $291,000.00. Computed at eight percent simple interest for five years, General's prejudgment interest amounts to $116,400.00.

In all, General is entitled to an award in the sum of $510,450.00, consisting of $394,050.00 in reliance damages and prejudgment interest in the sum of $116,400.00.

### III.

Based on the foregoing, the court directs entry of judgment for D & G Stout, Inc. and against Bacardi Imports, Inc. in the sum of $510,450.00. Judgment shall be entered for Bacardi Imports, Inc. on the claims of David and Georgia Stout. Costs shall be assessed against Bacardi.

SO ORDERED.